Florence LANE, Appellant,

v.

AMSTED INDUSTRIES, INC. and
Bossert Company, Respondent.

No. WD 40991.

Missouri Court of Appeals,
Western District.

Nov. 14, 1989.

David Q. Reed, and Howard L. Lotven, Kansas City, Mo., for appellant.

Pieter A. Brower, Kansas City, Mo., for respondent.

Before SHANGLER, P.J., NUGENT, C.J., and LOWENSTEIN, J.

SHANGLER, Presiding Judge.

The plaintiff Florence Lane appeals from a judgment entered on a jury verdict on her claim for personal injury from a defective automatic drill press manufactured by the defendant Amsted Industries, Inc. and distributed by the defendant Bossert Company.

The plaintiff was employed by Lyons Die Casting as a drill operator at the time of the occurrence of injury. The machine was a Deka 712, a multi-purpose press that functioned to drill holes by means of rotating spindles used in different patterns according to the set up. The upper part of the machine, from which the spindles protrude, is fixed and does not move during the operation of the machine. The piece to be drilled is clamped upon a platform that moves upward into the spindles to accomplish the desired operation.

The Deka 712 is an automatic drill: once the operator actuates the intended operation, the machine commences and follows a cycle predetermined by the program. The operator motivates the machine by a foot switch and then the platform, on which the piece to be drilled rests, automatically lifts the piece upward into the spindles for the machine operation. Once the machine is turned on, the spindles operate continuously and independently of the foot switch. The operator can stop the advance of the platform and the rotation of the spindles by striking a panic button located near the head of the machine.

The plaintiff was injured when her left ring finger became impaled on a spindle after she clamped the piece onto the platform and the machine was put into operation. She lost a part of that finger. The date of that occurrence was April 16, 1981. The drill was manufactured by the defendant Amsted in 1967, sold to the South Bend Lathe in that year, and then sold to Lyons Die Casting in 1968 by the defendant Bossert, the distributor for South Bend Lathe.

The plaintiff brought a petition against Amsted, South Bend Lathe, and Lyons Die Casting. It alleged three separate theories of recovery—negligence, breach of implied warranty, and strict liability in tort. The petition was dismissed as to South Bend Lathe before the commencement of the trial, and was otherwise amended to delete the counts of negligence and breach of implied warranty pleaded against Amsted and Bossert. The count that remained asserted the strict liability of the defendants Amsted and Bossert for the manufacture and distribution of a product unreasonably dangerous to a user when put to the use reasonably anticipated by reason of defective design, and the failure to warn of the danger. Among those defects was the lack of a guard that would have prevented an operator's fingers from contact with the rotating drills. The plaintiff sought punitive as well as compensatory damages.[1]

On the day of trial the plaintiff moved in limine to exclude from evidence any cross-examination or other proof of industry standards as to the design and use of the drill press. The court ruled that industry safety standards, otherwise irrelevant to a cause of action in product liability, bore on the state of mind of the manufacturer and distributor of the product, and hence on the issue of punitive damages. And, indeed, the plaintiff presented to the jury on opening statement the indifference of the defendants to safety, and a request for punitive damages on that account. A submissible issue of punitive damages, however, was

---

1. The petition alleged a cause of action that accrued to the plaintiff on April 16, 1981. Accordingly, the claim as pleaded and tried was not affected by products liability sections 537.-760 through 537.765 of the Tort Reform Act. § 537.069, RSMo 1986. That enactment is made to apply "to all causes of actions accruing after July 1, 1987"—the effective date of the Act. Our decision responds to the issues as posed by the pleadings and determined by the evidence under governing law before the Tort Reform Act.

not proven, and the court precluded the defense from allusion or argument of industry standards to the jury.

The case was submitted to the jury on theories of product liability and failure to warn. The issue of punitive damages was withdrawn from them. A verdict was returned for the defendants, and the plaintiff appeals. There is no contention that the submission of punitive damages was improperly withheld. On this appeal the plaintiff contends only that the admission of the American National Standards Institute [ANSI] Safety Requirements[2] was prejudicial—and on numerous grounds.[3] In fact, the document was never formally received in evidence, nor displayed to the jury, but became the basis for the examination and cross-examination of the experts.

The plaintiff presented two experts. The first of them, Gary Friend, was a mechanical engineer and safety analyst as to equipment design. He gave opinion that the best safety concept for the drilling machine used by the plaintiff was the addition of two palm buttons and that these could be designed to control both the rotating drills and the table movement. The palm buttons would function to keep the hands of the operator out of danger. He concluded that the machine was defective and unreasonably dangerous as designed.

The second of them, Dr. Donald Creighton, was professor of mechanical aerospace engineering, expert in machine design and machine design synthesis. He gave opinion that the Deka 712 machine was unreasonably dangerous as designed. The defects were the continuous operation of the drills from the time the machine is activated—even during the feeding of the parts—until the completion of the program, and the hazard of the hands being trapped between the platform and drills once the machine was activated. He gave opinion also that the machine could have been made safe by the addition of palm buttons to operate the cycle, or by the installation of an enclosure guard.

On cross-examination the expert witnesses acknowledged that they were familiar with the American National Standards Institute and referred to their promulgations in the instruction of their students. The inquiry was then directed to the industry safety standard for drilling machines—ANSI B11.8–1974. The trial court had already determined in limine that the standard was relevant—and hence admissible—on the issue of conscious disregard by the manufacturer and distributor of the safety of a user of the drill, and so on the culpable state of mind the proof of punitive damages entails.

On actual cross-examination of these experts, counsel for the defendants suggested to the court that the reasonably anticipated use of the machine at the time of manufacture and sale was also relevant to the state of mind in issue in a claim for product liability punitive damages, and proposed to use the ANSI standards for that inquiry. Counsel for the plaintiff objected on the ground that, whatever the relevancy of the standards on the issue of state of mind, that source of evidence was altogether irrelevant to the basic strict liability product defect cause of action—and so to the element of *reasonably anticipated use* that cause of action encompasses. The trial court nevertheless allowed the evidence and inquiry.

2. The publication bears the definitive title: "American National Standard Safety Requirements for the Construction, Care and Use of Drilling, Milling, and Boring Machines" as approved May 14, 1974, by the American National Standards Institute, Inc.

3. The defendants Amsted and Bossert respond on appeal that, any error in the admission of the ANSI standards notwithstanding, the judgment may not be reversed since the plaintiff failed to prove a submissible issue of product liability. The defendants, of course, were not aggrieved by the judgment entered by the trial court on the verdict of the jury, and so do not stand to assert submissibility—or any other issue—as trial error as a ground for our affirmance. *Grippe v. Momtazee*, 696 S.W.2d 797, 798[1, 2] (Mo. banc 1985). Our duty on review, rather, is to decide the errors alleged by the party aggrieved—in this case, the plaintiff. Only after error that entitles the party aggrieved to a new trial is found, does the court of review consider the question of submissibility. *Id.* at 799.

The particular ANSI standards used to interrogate the experts were components of *Standard 5—Safeguarding* and *Standard 6—Operation of [the] Machines.* They do not relate to product design, as such, but with the initiatives expected of an employer to ensure the safe operation of the Deka 712 press as designed. Among the standards read and posed to the experts for agreement or disagreement or opinion [and hence before the jury] were Sections 5.1, 5.7, 6.1.1 and 6.1.2. These standards state:

*Section 5.1 [Safeguarding] Responsibility*

It shall be the responsibility of the employer to provide, and ensure the use of, a guard, guarding device, awareness barrier, awareness device, or shield as required by the rest of Section 5.

*Section 5.7 Design, Construction, Setup, and Use of Fixtures*

The employer shall be responsible for instituting fixture procurement and specification procedures that will eliminate hazardous conditions with respect to design, construction, and use of fixtures. The fixture manufacturer shall be responsible for designing and constructing all new fixtures to conform to this standard.

*Section 6.1.1 [Employer Responsibility] Training Employees*

The employer shall ensure that all setup men, setup operators, operators and helpers are adequately trained and competent to safely perform the functions for which they are responsible. The training shall include making the employees familiar with the portions of this standard related to their work.

The substance of Section 5.6 of the standards, describing different shields and guard devices, was also the subject of interrogation. It was the response of both experts that guards should be designed and built into the machines. One of the experts responded also that it was "ridiculous" to impose, as does Section 5.1, that obligation on the employer. There was other expert response that a usual employer has no knowledge of even the existence of these standards and is otherwise without the ability to comply.

At the conclusion of the plaintiff's case the court ruled that the evidence did not make out a submissible issue of punitive damages and withdrew that issue from the jury.

The defendants Amsted and Bossert then presented Peter Barroso as an expert witness. He was a mechanical engineer who served an ANSI committee to develop consensus standards for the machine tool industry. It was his testimony that the multipurpose Deka 712 is sold with "nothing in it"—no tooling, fixtures, cutters or system. The purchaser [employer] installs the tools, the cutters, piece parts and system. The manufacturer cannot know what the configuration on the system will be—and hence where the point of operation and primary hazard will be—and so does not routinely equip the presses with guards. That is because no single guard will function with all configurations of systems. A multipurpose machine tool, such as the Deka 712, is used to manufacture a multiplicity of parts, each shaped by individual fixtures, cutters and other equipment, and each requires a guard suitable to that particular operation. That is to say, the Deka 712 functions as a complete system for the first time in the factory of the purchaser, and it is for that reason that the user of the drill "must determine what safeguarding" should be installed.

The expert gave opinion that the Deka 712 is a reasonably safe machine and not defective for its intended purpose as a multiple spindle machine component. In response to cross-examination, the witness explained that although the dual palm buttons were adaptable to the Deka 712 as a safety device, the design had "a number of down sides." The need for the operator to compress the two palm buttons continuously during the machine cycle introduces worker fatigue and even disability. Also, the abrupt interruption and restart of the machine cycle the function of that device entails, introduces the danger of snapping drills and flying missiles into the operation. The witness gave opinion also that the dan-

gers associated with moving cutters is open and obvious, so a warning on the machine is not required.

The cause of action was submitted to the jury under theories of defective design and failure to warn of the danger of the defect. The verdict was for the defendants. On this appeal, the plaintiff contends that the trial court committed prejudicial error by the admission of the ANSI standards which placed responsibility for machine guarding on the purchaser of the equipment [the employer] rather than on the manufacturer, as our law requires. The sense of the argument is that this misuse of voluntary industry standards, even if otherwise admissible to show state of mind on the punitive damages issue, so misled the jury as to have prejudiced its determination of the basic product defect claim and a return of actual damages.

■ A claim in strict tort liability for product design defect requires no more proof than that the design renders the product unreasonably dangerous. *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 377 (Mo. banc 1986). In this proof fault is not an issue, nor is the state of mind of the defendant. The knowledge of the defendant is also irrelevant to the cause of action. *Id.* at 383. For this reason, a manufacturer may be liable for a product design defect even though the state of the art was such that the danger was not then scientifically knowable. *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434, 438[4–6] (Mo. banc 1984); *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491, 492 (Mo. banc 1986). The focus of attention is the condition of the product, and not the quality of the defendant's actions. Thus, an industry consensus of standard or custom that rests the duty on the purchaser [employer] to safeguard a machine does not absolve the liability of the manufacturer to make the product safe by a feasible design when without it the machine creates an unreasonable risk of harm. *Duke v. Gulf & Western Manufacturing Co.*, 660 S.W.2d 404, 416 (Mo.App. 1983). Therefore, evidence that someone other than the manufacturer or seller had the duty to provide guards to make the product safe introduces a false and prejudicial issue in the proof of the basic product design cause of action. *Id.*

■ A claim for punitive damages may be recovered in a claim for strict tort liability. To prove that recovery, the plaintiff must present evidence that the defendant not only placed an unreasonably dangerous product in commerce, but also knew of its defective condition and thereby showed complete indifference to or conscious disregard for the safety of others. MAI 10.05 (Supp.1989). The element of knowledge, irrelevant to the basic strict liability product defect cause of action, is a required proof for punitive damages liability. *Sparks v. Consolidated Aluminum Co.*, 679 S.W.2d 348, 354 (Mo.App.1984). Moreover, it is the actual knowledge of the defendant that must be shown—constructive knowledge does not suffice. *School Dist. of Independence v. U.S. Gypsum Co.*, 750 S.W.2d 442, 446[2] (Mo.App.1988).

■ It is logical, therefore, that where the focus of attention is not the character of the product but the knowledge of the defendant, state of the art evidence [4]—oth-

---

**4.** The judicial decisions and some commentary employ the term *state of the art* without distinction to mean industry practice and custom, industry capability, industry or scientific knowability, and even compliance with governmental regulations. *See* Note, When the Best Defense is No Defense: The Future of State-of-the-Art Evidence in Product Liability Actions in Missouri, 50 Mo.L.Rev. 438, 439–440 n. 6 (1985) (authored by Melody Richardson Daily). The Uniform Product Liability Act § 106 separates the generic definition into *state of the art* and *industry customs.* The current and critical trend favors this distinction. *Carter v. Massey–Ferguson, Inc.*, 716 F.2d 344, 348–349 (5th Cir.

1983); G. Robb, A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases, 77 N.W.L.Rev. 1, 4 n. 10 (1982).

For convenience, our opinion [as does *Johnson v. Hannibal Mower Corp.*, 679 S.W.2d 884 (Mo. App.1984) ] uses *state of the art* to mean industry practice and custom. We do so with awareness that the *state of the art* evidence addressed by our supreme court en banc in *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984) and rejected as irrelevant to the basic products design cause of action, was the scientific unknowability of the dangerous defect at the time of manufacture. That is the sense new

erwise irrelevant to the proof of the basic product design cause of action—addresses a material issue in litigation and so is admissible. Compliance with industry standard and custom impinges to prove that the defendant acted with a nonculpable state of mind—without knowledge of a dangerous design defect—and hence to negate any inference of complete indifference or conscious disregard for the safety of others the proof of punitive damages entails. *See Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376[11, 12] (Former 5th Cir.1982); N.P. Terry, Retreat and Reaction: An Analysis of the Tort Reform Act, 56 U.Mo. K.C.L.Rev. 205, 215 (1988). It was as a response to this issue of state of mind that the defendants Amsted and Bossert resorted to the ANSI industry standards and customs for the cross-examination of the plaintiff's experts. It was for the inference that industry custom connotes continued approval of the safety of the product design that Amsted and Bossert used that evidence. It was to show compliance with the consensus that the ultimate user whose systems determine the point of operation—and hence the source of danger—is responsible to equip the guards, and not the manufacturer. *Sawyer v. Niagara Machine and Tool Works*, 535 So.2d 1057, 1060–1061 (La.App.1988); *Jimenez v. Gulf & Western Mfg. Co.*, 458 So.2d 58, 59[1, 2] (Fla.App.1984); M.S. Madden, Products Liability § 8.3 (1988).

We do not accept the argument the plaintiff makes that, the admissibility of the ANSI standards on the issue of punitive damages assumed, their use to show the custom that the ultimate purchaser and not the manufacturer bears the responsibility to furnish safety guards on a multi-purpose drill press introduces an element so incongruous to the proof of the basic product design defect claim as to mislead the jury. It is to be said that under our precepts of such a cause of action, where conduct and state of mind are irrelevant to the proof of compensation damages but are of the very essence of punitive damages, a plaintiff who seeks both measures courts befuddlement of the jury. All the more so, where the issue of punitive damages is not submitted but the evidence of the benign conduct of the defendant—irrelevant on the issue of compensation damages—remains before the jury. There are aids for a litigant beset by that inherent quandary of such a litigation, but the plaintiff did not invoke them.

 Thus, the complaint of the plaintiffs that the ANSI standards, even though admissible on the punitive damages issue of state of mind of the defendants, were not admissible on the issue of reasonably anticipated use of the press, will not be heeded.[5] When evidence admissible for one purpose but not for another is received, a party upon request is entitled to the instruction of the court to limit the extent and purpose for which the jury may consider the evidence. *Dyer v. Globe–Democrat Publishing Co.*, 378 S.W.2d 570, 581[7] (Mo.1964). It was open to the plaintiff at the tender of the evidence to abet the integrity. of the jury consideration by a request for such a direction, but none was made. *See Fisher v. Johns–Manville Corporation*, 103 N.J. 643, 512 A.2d 466, 481[8] (1986); 4 American Law of Products Liability 3d § 60:40 (1987). It was open to the plaintiff at the end of her case, when the court ruled a submissible issue of punitive damages was not proven, to seek the direction of the court to withdraw all the evidence on that abandoned issue from the jury, and so remove the distraction of a false issue. But none was sought. MAI 34.01 and 34.02 (1981); *Lieber v. Bridges*, 650 S.W.2d 688, 690[1] (Mo.App.1983).

The evidence of the ANSI standards and customs was relevant at the time of admission, and was used in good faith and to a lawful end. The complaint of the plaintiff

products liability § 537.764.1 imparts to the definition of *state of the art* in the Tort Reform Act, and renders admissible as a "complete defense … in an action based upon strict liability for failure to warn of the dangerous condition of a product."

5. It is to be noted that the standards, other than to elicit the opinions of the experts, was never a subject of comment or argument to the jury. That was foreclosed by the court after the punitive damages issue was ruled not submissible at the close of the plaintiff's case.

is that of a thwarted suitor, and not of an aggrieved party. She does not complain that the trial court refused any request for aid to confine the adjudication of the jury to the single issue for determination: the defect of the product. Whatever confusion of issues that may have beset the jury was not the result of trial error. The point is denied.

■ The plaintiffs argue that whatever the probativeness on the state of mind of the defendants of industry standards already in being at the time the product was manufactured and distributed, the ANSI standards formulated in 1974—some seven years later—were without effect on that issue and irrelevant to punitive damages. The proof of punitive damages in a product defect and failure to warn case [the theories submitted by the plaintiff], however, entails not only the state of mind, but the knowledge of the defendants as well. MAI 10.05 (Supp.1989); *Sparks v. Consolidated Aluminum Co.*, 679 S.W.2d at 354. The plaintiff contends that since the formal standards were not promulgated until 1974, the defendants could have had no knowledge of them before, and so could not show by them that their conduct in 1967 was governed by the standards of 1974 to avoid punitive damage liability.

The 1974 ANSI standards were the only evidence of any formal custom and practice of the industry concerning the safeguarding of an automatic multi-purpose press such as the Deka 712. There is no intimation of any comparable formulated industry standard before 1974. The argument of the plaintiff that the defendants could have had no knowledge of the industry standards before 1974, however, rests on false premises. It assumes that the standards connote when the engineering knowledge they embody became available to the industry and when the industry consensus the standards express came into being. It was the testimony of all the experts, however, that the locations of the primary hazards to the operator of such a machine—the trapping space and points of operation as determined by the configurations of use imposed on the machine by the owner—were al-

ready known to engineers and quantified by the industry some fifty years before 1967. The point of operation guarding, which the 1974 standards address, was not an engineering concept announced by that publication. It was also the testimony of the experts that the consensus the 1974 standards express represents a collation of diverse opinion already accommodated before expression as a formal standard.

The ANSI industry standards of 1974, therefore, were relevant to negate the inference essential to the proof of punitive damages, that at the time of manufacture and failure to warn, the defendants had knowledge of the defective design, but nevertheless, with complete indifference or conscious disregard to the safety of others, put the defective product in commerce.

The judgment is affirmed.

All Concur.