**Patricia SAPP, Sheila Bennett, Christine Phillips and Arcie Sapp, Jr., Appellants,**

v.

**MORRISON BROTHERS COMPANY and Eckelberry Service Co., Respondents.**

**No. WD 68928.**

Missouri Court of Appeals, Western District.

May 19, 2009.

As Modified June 23, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 23, 2009.

Application for Transfer Denied Nov. 17, 2009.

472

J. Kent Emison, Lexington, and David L. Steelman, Rolla, for appellants.

Susan Ford Robertson, Columbia, for respondent.

Before VICTOR C. HOWARD, P.J., and JOSEPH M. ELLIS and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

In this wrongful-death case, Plaintiffs–Appellants, the survivors of Arcie Sapp ("the Sapps"), appeal from the trial court's denial of their motion for new trial following a jury verdict in favor of Defendant–Respondent Morrison Brothers Company. The Sapps argue that they are entitled to a new trial because of: (1) a juror's misconduct in intentionally withholding information during voir dire; (2) the trial court's refusal to give a limiting instruction concerning evidence of Arcie Sapp's employer's conduct; and (3) the trial court's failure to strike a juror for cause based upon alleged bias or prejudice. For the reasons which follow, we affirm.

## Factual Background

On January 7, 2005, Arcie Sapp, an employee of MFA Oil, Inc., was severely burned when unleaded gasoline ignited while he was pumping fuel into a bulk storage tank at an MFA facility. Mr. Sapp died of his injuries twelve days later.

The Sapps brought this wrongful death suit against various defendants, including Morrison Brothers, for the death of Arcie Sapp. As relevant here, the Sapps claimed that the accident was caused by the malfunctioning of the storage tank's emergency vent, and another combination vent/alarm. Morrison Brothers manufactured both the emergency vent and the combination vent/alarm that the Sapps alleged had failed.

The case was tried before a jury in the Circuit Court of Jackson County from May 14 through June 1, 2007. The Sapps' claims against Morrison Brothers were submitted on multiple theories, including strict liability and negligence claims for defective design and failure to warn with respect to both the vent/overfill alarm and the emergency vent. The jury returned a defense verdict. The trial court entered judgment on the verdict, and subsequently

denied the Sapps' Motion for New Trial. This appeal follows.[1]

## Analysis

### I. Juror Non–Disclosure Claim

In their first Point Relied On, the Sapps argue that the trial court erred in denying their motion for a new trial because a juror we will refer to as "E.B." failed to disclose information about prior litigation in which she had been involved.

#### A.

In reviewing the denial of a motion for new trial based on a claim of juror nondisclosure, "[t]he threshold determination of the clarity of a question [asked during voir dire] is reviewed *de novo.*" *McBurney v. Cameron,* 248 S.W.3d 36, 42 (Mo.App. W.D.2008) (*en banc*). "It is only after it is objectively determined that the question *was* reasonably clear in context that we consider, under an abuse of discretion standard, whether the trial court abused its discretion in deciding whether a nondisclosure was intentional." *Id.*

#### B.

The jury non-disclosure issue in this case arises in a somewhat novel context. During voir dire questioning, counsel for Morrison Brothers (*not* the Sapps) asked prospective jurors the following:

[A]re there any jurors *who have brought a suit for personal injury or damages* against someone else or a company, or anybody in your family that's done so? *Now, let me qualify that.*

*We don't want to know about divorce. We don't want to know about small claims court or property-type disputes.* The question is: Anybody in the jury box or your immediate family or a very close friend that you would have talked to about that, *have you instituted a lawsuit for personal injury or damages?*

E.B. did not respond. Counsel for Morrison Brothers then asked:

*Has anyone participated in court as a witness, not necessarily as a witness in court?* Let me start with the jury box. *Any of you ever been in the witness box?*—which is over there. I don't mean literally in that seat, *I mean in any courtroom in a witness box.* Anybody?

Again, E.B. did not respond.

On the last day of the three-week trial, counsel for the Sapps discovered, through an internet search, a case caption apparently containing E.B.'s name, and brought the issue to the trial court's attention. Following a conference with counsel, the trial court questioned E.B. in chambers:

THE COURT: Something has come up that I wanted to talk to you about. You're not in trouble or anything like that.

It came to my attention that there was a personal injury lawsuit filed in the year 1992 by somebody named [E.B.], and I didn't know if it's the same [E.B.]—it might not be. *But have you ever filed any kind of a lawsuit for personal injuries?*

JUROR [E.B.]: No, not that I know of.

MR. SULLIVAN: That solves that.

---

1. The Sapps also submitted a negligence claim against J.L. Eckelberry d/b/a Eckelberry Service Company, who had placed a weld on the storage tank. The court entered judgment on the jury's verdict in Mr. Eckelberry's favor. The Sapps argue that the grounds for reversal they are asserting apply equally to Mr. Eckelberry; for its part, Morrison Brothers contends that the Sapps have not appealed the judgment in Mr. Eckelberry's favor. Given our disposition, we need not resolve this issue.

JUROR [E.B.]: *I have never filed a lawsuit. I have never—*

THE COURT: *Have you ever had a property damage claim for your car where your insurance company might have filed what's called a subrogation action* for the damage to the car or they paid for repairing your car and then sued somebody else?

JUROR [E.B.]: Not that I know of.

THE COURT: Mr. Emison, do you want to ask any follow-up questions?

MR. EMISON: No.

THE COURT: Mr. Sullivan?

MR. SULLIVAN: No.

After the defense verdict, the Sapps argued that they were entitled to a new trial because E.B. had failed to disclose that, in 1992, she had filed a lawsuit in associate circuit court for property damage arising out of an automobile collision. In support of their motion the Sapps submitted the court file in the property damage case, E.B.'s deposition in that lawsuit, and an affidavit signed by E.B.

Although—as we discuss below—neither the voir dire questioning nor the trial court's in-chambers follow-up clearly called for E.B. to disclose information concerning a property-damage suit she had filed in her own name, or testimony she had given outside a courtroom, in her affidavit E.B. stated:

4. During the jury selection process, I understood that certain questions were asked by the attorneys seeking information about prior lawsuits for damages in which prospective jurors were involved, including the lawsuit for damages in which I was involved. . . .

5. During the jury selection process, I understood that certain questions were asked by the attorneys seeking information about instances in which a prospective juror had given sworn testimony as a witness either in court or out of court, including the testimony I gave [in the prior lawsuit]. . . .

6. In addition to questions during the jury selection process, I was also questioned by Judge Manners concerning my involvement in prior lawsuits. At that time, I understood that Judge Manners was seeking information about prior lawsuits in which I was involved, including the lawsuit in which I was involved. . . .

7. I confirm that I was the plaintiff and gave sworn testimony as a witness in the [prior] lawsuit. . . .

Neither party called E.B. as a witness during the hearing on the Sapps' new-trial motion.

The trial court rejected the Sapps' jury nondisclosure argument in a detailed order. The court first found that the questions asked during voir dire, and during the court's in-chambers follow-up, did not unequivocally call for E.B.'s disclosure of a property-damage lawsuit she filed in her own name, or her testimony in an out-of-court deposition:

Although the original question asked about jurors who brought a suit for damages—which would, presumably[,] include property damages to an automobile—Morrison Brothers' counsel narrowed the scope of this question by saying: "We don't want to know about . . . property-type disputes." This [statement] *could* have referred to a property damage case—like the one [E.B.] filed in 1992—but it might also have referred to a property dispute in a probate or partition action (among others). In other words, it was capable of more than one construction and was, therefore, unclear, *Ewing [v. Singleton,* 83 S.W.3d 617, 622 (Mo.App. W.D.2002)]. Since the question was ambiguous, this Court is unable to conclude that "a lay person would rea-

sonably conclude that the undisclosed information was solicited by the question." *Ibid.* at 621.

The same thing seems to be true of the second question, pertaining to being a witness. The initial question asked by Morrison Brothers' counsel was contradictory: "Has anyone participated in court as a witness, not necessarily as a witness in court?" What does that mean? Counsel clarified the question, slightly, by adding: "I mean in any courtroom in a witness box." Viewed in context, the gist of that question seemed to be that counsel only wanted to know if any venireperson has testified in court.... The question asked by defense counsel did not unequivocally compel [E.B.] to disclose her experience as a deponent.

The circuit court reached the same conclusion concerning its own in-chambers questioning, which was limited to either "a personal injury lawsuit," or "a subrogation suit filed by [E.B.'s] insurance company."

Based on this analysis, the trial court concluded that it was required to reject the Sapps' juror misconduct claim, "because the essential prerequisite of a clear question is not satisfied." Although the court acknowledged that it "was unable to form any opinions about [E.B.'s] credibility since it could not observe her demeanor," the court nevertheless went on to find E.B.'s nondisclosure intentional:

[T]he plain language of her affidavit convinces this Court that [E.B.] recalled her 1992 suit both during *voir dire* and during her examination in chambers. The questions asked, *as she understood them,* called for her to reveal information about the 1992 suit. Despite that knowledge, she remained mute. The ineluctable conclusion is that she intentionally failed to disclose that information, which failure would, as has been

noted earlier, ordinarily *require* a new trial. The only thing impeding this Court from reaching that conclusion at bar is the holding of the cases like *Keltner [v. K–Mart Corp.,* 42 S.W.3d 716 (Mo.App. E.D.2001),] which seem to preclude this Court from reaching the question of intentional nondisclosure in the absence of a clear question.

Although it considered itself bound by this Court's prior decisions, the circuit court cogently explained why it believed the prerequisite of an unambiguously clear voir dire question was unnecessary where a juror admitted to a subjective awareness that voir dire questioning called for the information she withheld:

A persuasive criticism of this holding might be that however ambiguous the questions were, [*E.B.*] understood them to call for a response which she chose not to make.... If a venireperson might reasonably be unable to understand that a particular question required her to reveal her litigation experience in a particular kind of case, then she should not be accused of nondisclosure. But the efficacy of that rationale would appear to evaporate when a venireperson *does* understand that such experience is the subject of the inquiry even though, because of ambiguity, other reasonable venirepersons might not. If the purpose of the rule is to assure that venirepersons are not misled into nondisclosure, then it is difficult to see how that end is furthered at bar.

## C.

■ We begin our analysis of the jury non-disclosure issue with a reminder that "[c]ourts should not overturn a jury verdict lightly. Trials are costly—for the litigants, the jurors and taxpayers." *Keltner v. K–Mart Corp.,* 42 S.W.3d 716, 722 (Mo. App. E.D.2001). We also recognize that—

in Missouri's state courts as perhaps no-where else—claims of nondisclosure of a juror's prior litigation history can be a powerful weapon in the hands of a verdict loser, plaintiff or defendant: in Missouri, " 'a finding of intentional concealment [of prior litigation experience] has "become tantamount to a per se rule mandating a new trial." ' " *Harlan ex rel. Brines v. Cibis,* 882 S.W.2d 138, 140 (Mo. banc 1994) (quoting *Wilford ex rel. Williams v. Barnes Hosp.,* 736 S.W.2d 33, 37 (Mo. banc 1987)).

In *McBurney v. Cameron,* 248 S.W.3d 36 (Mo.App. W.D.2008) (*en banc*), this Court only recently emphasized that a finding that a voir dire question clearly and unambiguously called for information which a juror withheld is a *sine qua non* of a successful jury nondisclosure claim. Un-der the heading "The Threshold Issue—Clarity," the Court explained:

> While a juror has a duty to respond truthfully, the lawyers have a duty to frame their questions in a way that makes clear what information is being sought. Ambiguity in the phrasing of questions cannot create a unilateral op-tion to demand a new trial based on nondisclosure. Thus, intentional nondis-closure can be found only if a *clear* question is asked on *voir dire.* There is no issue of nondisclosure when the ques-tion does not trigger a duty to respond.

> The first issue, therefore, in a case of claimed nondisclosure is whether the question, in context, was clear and un-ambiguous. This is an objective inquiry that looks to whether the appellant can show that there exists "no reasonable inability to comprehend the information solicited by the question." In other words, if a person could reasonably be confused, the question is not sufficiently clear to warrant further inquiry into the alleged nondisclosure.

> ... With regard to the issue of clarity of the question, it cannot help an appel-lant to argue that a reasonable venire member *could have* understood the question (that is, could have understood what counsel intended). The issue is whether a reasonable venire member *would have* understood what counsel in-tended.

*Id.* at 42 (citations omitted).

■ Numerous other decisions make the same point: the first, threshold inquiry in a jury nondisclosure case is whether, on an objective analysis, the voir dire ques-tioning clearly and unambiguously trig-gered the juror's obligation to disclose the omitted information. *See, e.g., McHaffie ex rel. McHaffie v. Bunch,* 891 S.W.2d 822, 829 (Mo. banc 1995) ("Nondisclosure can occur only after a clear question is asked on voir dire."); *Harlan ex rel. Brines,* 882 S.W.2d at 139 ("Nondisclosure, whether intentional or unintentional, can occur only after a clear question is asked on voir dire."); *Massey v. Carter,* 238 S.W.3d 198, 201 (Mo.App. W.D.2007) ("There is no non-disclosure if counsel does not ask a clear question."); *Ewing v. Singleton,* 83 S.W.3d 617, 621 (Mo.App. W.D.2002) ("Absent a clear question, however, a panel member's failure to provide information cannot con-stitute an intentional or an unintentional nondisclosure."); *Keltner,* 42 S.W.3d at 722, 723 ("The Supreme Court of Missouri has consistently made clear that a finding of non-disclosure requires a preliminary determination: *Was the question clear?* "; "Only after the court has determined that the question is clear does it proceed to the question of whether the non-disclosure was intentional or unintentional.").

*Keltner* explains some of the important reasons for this prerequisite:

> First, in the absence of a clear ques-tion verdicts may be impeached on the basis of surmise and conjecture. . . . Sec-

ond, no legitimate purpose is served by requiring jurors to appear at a post-trial hearing, under a cloud of suspicion, unless the court has already determined that the question the juror allegedly failed to answer unequivocally triggered the juror's duty to respond. Third, it ill serves the judicial system to subject jurors to the embarrassment and inconvenience of a post-trial hearing and thereby add to the reasons so many citizens are reluctant to serve as jurors.

... [Fourth,] [a]ttorneys should know the sort of information they desire from the panel. They control the form of the questions they ask. If the plaintiff's attorney fails to ask a material question clearly, the defense is free to ask that question more clearly. Courts will not permit attorneys to take advantage of their own or their opponent's ambiguous questions to impeach a verdict they dislike.

*Id.* at 722–23 (internal footnotes, citations omitted).

■ The requirement of an objectively clear question should, we believe, apply with full force in the admittedly unusual. circumstances of this case, where a juror has acknowledged, *post hoc*, her *subjective* understanding that voir dire questions called for information in her possession.[2] First, allowing jurors' *post hoc* testimony as to their subjective interpretation of voir dire questioning to be determinative would subject jurors to unnecessary post-trial inconvenience and potential harassment. Presently, we presume jurors are spared the inconvenience and stress of post-trial inquiries and court appearances in many cases because counsel conclude that the voir dire questioning fails to satisfy the

standards of clarity necessary to support a colorable nondisclosure claim. Under the subjective standard the Sapps advocate, however, the verdict-loser would have every incentive to approach jurors to elicit their acknowledgment that *they* understood the information counsel was seeking, no matter how vague or confusing the questioning might objectively appear. Further, trial courts would presumably be required to subpoena jurors to testify at post-trial evidentiary hearings, even in cases where the voir dire questioning was itself ambiguous: no matter how disjointed, cryptic or vague the voir dire questioning actually was, an attorney could always argue that a juror *might*, if called to testify, attest that they actually understood what the questioner was seeking.

Second, *Keltner*'s observation that attorneys are the masters of their own voir dire questioning, and know what information they consider important to their exercise of for-cause and peremptory challenges, applies here with equal force. An attorney should not be permitted to argue, after the time and expense of a trial, that they were denied information which was material to jury selection, when that attorney failed to even ask clear and direct questions seeking that information at a time when he or she was completely free to do so (and could have acted on the information thus elicited, if the attorney in fact considered it significant). Before a court is asked to find that information is so significant that its withholding justifies the extraordinary remedy of a new trial, counsel should be required to explicitly ask for it. (Seen in this light, the requirement that counsel ask a clear question that solicits the omitted

---

**2.** We do not necessarily share the trial court's belief that E.B.'s affidavit acknowledged that she had a *present recollection*, during voir dire, of the lawsuit in which she had been

involved fifteen years earlier. Given our disposition, however, we need not pursue this issue further.

information is akin to a preservation-of-error requirement.)[3]

Third, upholding the Sapps' argument would require this Court to reject the many decisions (including this Court's recent *en banc* decision in *McBurney*) which have held that the determination whether a question is clear is an *objective* inquiry, subject to *de novo* review in the appellate courts. If jurors' testimony as to their personal, subjective understanding is controlling, we presume that assessing an individual juror's state of mind would be a factual determination subject to deferential appellate review; and a juror's *post hoc* understanding, no matter how implausible, would potentially be controlling, however the voir dire questioning may appear in the "black and white" of a certified transcript.[4]

Finally, applying the subjective-understanding standard the Sapps advocate would put inordinate weight on the *post hoc* testimony of jurors concerning their own subjective state of mind—testimony which could not be conclusively disproved. While we in no way intend to suggest any impropriety here, we are hesitant to give such after-the-fact testimony virtually conclusive force in deciding a losing party's right to a retrial in multi-million dollar lawsuits like this one.

### D.

Applying the objective standard of clarity developed in prior case law, we agree with the trial court's assessment that the voir dire questioning at issue here did not clearly and unambiguously call for E.B.'s disclosure of her 1992 property damage lawsuit, or her deposition testimony in that lawsuit. With respect to the first question asked the venire panel concerning prior lawsuit experience, counsel for Morrison Brothers specifically indicated that he was *not* interested in "property-type disputes." So narrowed, venirepersons could have reasonably believed that they were not required to disclose actions involving solely property damage, like E.B.'s 1992 lawsuit.[5] With respect to the question concerning witness experience, we agree with the trial court's assessment that the question, as clarified by counsel, could reasonably be construed as requesting information only concerning *in-court* testimony, as opposed to out-of-court depositions. Finally, the court's in-chambers questions, when viewed objectively, requested information concerning only personal injury and subrogation lawsuits, and did not reach a property-damage lawsuit which E.B. prosecuted in her own name.[6]

3. Of course, a litigant can—as here—rely on voir dire questioning by its opponent. But it does so at its peril—if the questioning is not objectively clear, it cannot support a nondisclosure claim.

4. Thus, for example, in this case E.B.'s interpretations of the "witness" voir dire question (as comprehending out-of-court testimony), and the in-chambers questioning (as covering non-subrogation property damage lawsuits), seem to us to be demonstrably contrary to the questions which were actually asked. Under the Sapps' argument, however, we would be bound to defer to E.B.'s purported understanding, no matter how implausible it seemed.

5. *See Payne v. Cornhusker Motor Lines, Inc.*, 177 S.W.3d 820, 842–43 (Mo.App. E.D.2005) (taken in context, question asking venirepersons to disclose claims made "for personal injuries or monetary damages" did not clearly require disclosure of property-damage lawsuit in which venire member was a plaintiff).

6. Because the in-chambers questioning occurred well after voir dire—on the last day of trial, no less—we question whether E.B.'s responses to such questions, even if untruthful, could independently merit a new trial, to the extent the in-chambers questions went beyond the information clearly and unambiguously requested during voir dire itself. The scope of voir dire could not be expanded by the trial

For these reasons, we reject the Sapps' jury nondisclosure claim. Point I is denied.

## II. Failure to Strike Juror S.H. for Cause

■ The Sapps' third Point also arises out of jury selection, and we therefore address it out of order. In Point III, the Sapps argue that the trial court committed reversible error in failing to strike an additional juror, "S.H.," for cause. Specifically, the Sapps argue that S.H. "should have been struck for cause because she made unequivocal statements of bias or prejudice on at least three different issues: caps on non-monetary damages such as pain and suffering; frivolous lawsuits; and caps on punitive damages." We disagree.

■ Our Supreme Court recently reiterated the standard of review for this issue:

A trial court's ruling on a challenge for cause will be upheld on appeal unless it is clearly against the evidence and is a clear abuse of discretion. The relevant question is whether a venireperson's beliefs preclude following the court's instructions so as to prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. . . . A venireperson's qualifications as a prospective juror are not determined by an answer to a single question, but by the entire examination. The trial court is in the best position to evaluate a venireperson's qualifications to serve as a juror

and has broad discretion in making the evaluation.

*Joy v. Morrison,* 254 S.W.3d 885, 888 (Mo. banc 2008) (quoting *State v. Christeson,* 50 S.W.3d 251, 264 (Mo. banc 2001)) (internal citations, quotations omitted). As *Joy* explained, "[t]he critical question in these situations is always whether the challenged venireperson indicated unequivocally his or her ability to fairly and impartially evaluate the evidence." 254 S.W.3d at 891. However, "[i]f the trial court is convinced that a juror can be fair and impartial after consideration of the entire voir dire examination, then the court is not required to disqualify a juror merely because a certain response, when considered alone, raises the bare possibility of prejudice." *Andersen v. Osmon,* 217 S.W.3d 375, 379 (Mo.App. W.D.2007). "[T]he self-assessment of prospective jurors that they can set aside their bias is, in most cases, sufficient evidence, in and of itself, to support the trial court's determination that the juror is not disqualified." *Ray v. Gream,* 860 S.W.2d 325, 334 (Mo. banc 1993). "Initial reservations expressed by venirepersons do not determine their qualifications; consideration of the entire voir dire examination of the venireperson is determinative." *Joy,* 254 S.W.3d at 891.

During voir dire, S.H., a Registered Nurse, explained that she had negative feelings about the particular plaintiffs' lawyers by whom she had been deposed in two different cases. She explained that she "felt both times [the plaintiffs' lawyers] were very accusatory, rude, inconsiderate; and that's where my opinions came

---

judge (or the parties) after trial had begun. *See, e.g., Porter v. Toys 'R' Us–Del., Inc.,* 152 S.W.3d 310, 319 (Mo.App. W.D.2004) ("failure to ask a question on voir dire waives the right to challenge the juror on any grounds not asked").

For this reason, we do not believe E.B.'s unsolicited in-chambers comment that "I

have never filed a lawsuit" could support a new trial, even if that statement were considered untruthful, because it was uttered well after jury selection had concluded, and went beyond the information counsel clearly solicited during voir dire.

from was just from those two cases." When asked whether she could separate those bad experiences from jury service in the present case, S.H. stated, "I feel I can." She explained her belief that "every profession has someone who makes them look good and someone who makes them look bad." When asked whether "that['s] something [the Sapps' counsel was] going to have to overcome in this case, to get beyond it?," S.H. replied "[y]es ... *and you already have.*"

Asked about restrictions on lawsuits, S.H. responded that

I've not studied it a whole lot with any of my co-workers. I do agree because I've seen too many lawsuits that I don't agree with. *However, I've seen lawsuits that I do agree with.*

When asked how her views concerning litigation reform would affect her assessment of the Sapps' claims, S.H. responded that

*I would have to say I would have to hear all the details of the case to give that answer.* ... Do I have preconceived ideas about those kinds cases [sic]? Yes. Do I know that her case is in any way similar to those. No. *I would have to hear details to make that decision.*

And while S.H. indicated that she believed there should be a cap on non-economic damages, she indicated that she would take a case-specific approach on this issue also: "Honestly, *I don't have any*—I don't have any kind of amount—*preconceived amount. I would have to hear everything to come up with that.*" As to whether the Sapps would be starting out behind based on S.H.'s feeling that there should be caps on punitive damages, she agreed, but only if she were acting *"without any other information."* Moreover, when defense counsel later asked for a show of hands if anyone on the venire panel felt that either side was starting out behind (noting his concern "that we all do start out equal"), S.H. remained silent.

Similarly, S.H. later emphasized that she would follow the law over any personal opinions she might have:

MR. SULLIVAN: * * * [W]ould you be able to put aside your preconceived notions [about damages caps or limitations] and assure us that within certainty you would follow the instructions of the judge and do what the law in Missouri requires?

VENIREPERSON 25: Yes.

MR. SULLIVAN: Is there anything you want to add to that? I understand you're in a tough spot and there's a lot going on in your head.

VENIREPERSON 25: Thank you. I do have strong opinions about that. But I've learned that people who make the laws know a lot more about that than I do, much more about that than I do. *So I am a law follower, and I would, without a doubt, go with the law over my opinion.*

MR. SULLIVAN: So you are modest enough to admit that the legislators know, sometimes, what they're doing? * * * And obviously the judicial branch knows a great deal about what's correct.

VENIREPERSON 25: Absolutely they do.

In denying the Sapps' request to strike Juror S.H. for cause, the trial court stated:

THE COURT: Well, here's—here's the difference with [Venireperson] 18, I had the sense that's somebody [who is] waiting to blow up the plaintiff. I mean regardless of what words she mouthed. I'll tell you, on 25 [S.H.], I thought the woman was sincere. I think she said that she didn't like some trial lawyers, but I will tell you I thought she was struggling.

I think this is a woman who will do her very level best to be fair. I don't think that—whatever her feelings are on some ideas, that she is going to allow that to stand in her way. I mean, the fact that she said you'd have to overcome her bad feelings about whatever that subject was, in my notes she said you've overcome them; and I think she was dead serious when she said that.

And I'm going to deny the challenge for cause to 25.

The trial court later noted, in sustaining a for-cause objection to another juror, that "[Venireperson 31] came back nicely, but not as nicely as 25."

In this case, we cannot say that the trial court committed a clear abuse of discretion in refusing to strike S.H. for cause; to the contrary, the transcript reflects that the trial court engaged in a careful, juror-specific, and fact-intensive assessment of the for-cause challenges the parties advanced.

The cases upon which the Sapps rely to support their theory that the trial court committed reversible error by failing to strike S.H. are distinguishable. S.H. specifically indicated that she would have to make a decision based on the facts and the law applicable to the case. Thus, unlike in *State v. Wacaser*, 794 S.W.2d 190 (Mo. banc 1990), this is not a case in which the challenged juror indicated that "he was not sure that he could render a fair verdict" on a particular issue, or that the juror "had formed an opinion [on a relevant issue] and gave no assurance that he would be likely to change his opinion." *Id.* at 192–93. And unlike the juror in *State v. Houston*, 803 S.W.2d 195 (Mo.App. W.D.1991), S.H. did not indicate that she "did not know if [s]he could be fair and impartial," nor did she simply indicate that she "believed" she could follow the law and the instructions. *Id.* at 197. Instead, S.H. unequivocally

agreed that she would be able to put aside her preconceived notions, follow the court's instructions, and do what the law and the evidence required. And unlike *State v. Edwards*, 740 S.W.2d 237 (Mo.App. E.D. 1987), this was not a case in which S.H. indicated that she would be more likely to believe a certain class of crucial witnesses. *Id.* at 243. Rather, S.H. made clear that while she may have disliked certain trial lawyers, had certain ideas regarding damages caps, and had a general feeling about frivolous lawsuits, she would view the facts and evidence in light of the law as instructed.

The trial court was in the best position to determine whether any alleged bias S.H. may have expressed during voir dire warranted striking her from the jury venire for cause. Given the deferential standard of review we apply to such issues, we cannot say that the trial court's decision to overrule the Sapps' for-cause challenge to Juror S.H. constituted a clear abuse of discretion requiring a new trial. Point III is denied.

### III. Failure to Give Limiting Instruction

In their second Point, the Sapps argue that the trial court committed reversible error by failing to tender a limiting instruction to the jury concerning evidence regarding MFA, Arcie Sapp's employer. We disagree.

As Arcie Sapp's employer, MFA was statutorily released from liability for his injuries and death. *See* § 287.120, RSMo. The Sapps moved *in limine* to prevent Morrison Brothers from arguing that MFA was negligent or that its conduct caused or contributed to the injuries and death of Arcie Sapp. Although the subject was revisited on multiple occasions during the course of the trial, and at the risk of over-simplification, the trial court's *in li-*

*mine* ruling was that, under *Lane v. Amsted Industries, Inc.*, 779 S.W.2d 754 (Mo. App. W.D.1989), evidence of MFA's actions or inactions was relevant to the Sapps' claim for punitive damages, but would not be admitted for any other purpose (although the court expressed some concerns to the extent the Sapps were submitting both strict liability and negligence theories).

During trial, and as relevant to the Sapps' second Point, evidence falling into three general categories was admitted: (1) evidence of communications between representatives of Morrison Brothers and MFA concerning risks associated with Morrison Brothers' vents, and necessary responsive actions; (2) evidence of MFA's obligation to inspect and maintain the vents under industry standards and Morrison Brothers' instructional materials, and its failure to do so; and (3) the fact that Morrison Brothers had not experienced any similar product failure at the facilities of any entity to which it sold its vents other than MFA (collectively "the MFA evidence").

At the conclusion of trial, the Sapps requested that the following limiting instruction be read to the jury:

> Plaintiffs have alleged that the Morrison Brothers Company 922 and 244 vents on Tank 7 at the Marshall Bulk Plant were defectively designed and unreasonably dangerous based on product defect, product defect for failure to warn, and based on negligence. Additionally, Plaintiffs have alleged that Morrison Brothers Company's conduct in designing and manufacturing the 922 and 244 vents amounted to a complete indifference or conscious disregard for the safety of others sufficient to warrant damages for aggravating circumstances.

Morrison Brothers Company denies these allegations.

> During the trial, you have heard testimony concerning the alleged conduct of MFA and alleged communications to or from MFA. With the exception of any communications to Arcie Sapp, this evidence may not be considered for the determination of whether the Morrison Brothers Company 922 or 244 vents were defectively designed and unreasonably dangerous or whether Morrison Brothers Company acted negligently in designing the 922 or 244 vents. However, such evidence may be considered for the determination of whether Morrison Brothers Company acted with complete indifference to or conscious disregard for the safety of others sufficient to warrant damages for aggravating circumstances.

> This instruction should be considered by you along with all the other instructions in this case.[7]

The trial court refused to give the Sapps' limiting instruction. In closing, Morrison Brothers' counsel referred to all three categories of MFA evidence described above.

At the hearing on the Sapps' new trial motion, the trial court explained that it had refused to give the proffered limiting instruction because the evidence at issue was relevant not only to the punitive damages issue—the limitation the Sapps asked the trial court to impose—but was also relevant to the Sapps' claims for negligent design and negligent failure to warn. We agree.

"When a trial court receives evidence admissible for one purpose but not for another, a party upon request is

---

**7.** Given our disposition (which focuses on the *substance* of the relief the Sapps requested below), we do not address the *form* of the instruction the Sapps proffered.

entitled to an instruction limiting the extent and purpose for which the jury may consider the evidence." *Eltiste v. Ford Motor Co.,* 167 S.W.3d 742, 756 (Mo.App. E.D.2005) (internal quotation marks omitted); *Clayton Ctr. Assocs. v. W.R. Grace & Co.,* 861 S.W.2d 686, 691 (Mo.App. E.D. 1993) ("When requested, an appropriate limiting instruction should have been given."); *Lane v. Amsted Indus., Inc.,* 779 S.W.2d 754, 759 (Mo.App. W.D.1989). "Whether to give a cautionary instruction is generally within the trial court's discretion." *Martin v. Durham,* 933 S.W.2d 921, 924 (Mo.App. W.D.1996).

■■■■ The giving of a limiting instruction depends on the making of "a proper request," however; "[i]n the absence of a proper request therefor, the objector cannot successfully complain of the failure of the court to give a limiting instruction." *Dyer v. Globe–Democrat Publ'g Co.,* 378 S.W.2d 570, 581 (Mo.1964). This is consistent with the more general, and fundamental, principle that "a party cannot request relief on appeal not sought in the trial court." *Bunting v. McDonnell Aircraft Corp.,* 522 S.W.2d 161, 168 (Mo. banc 1975).

■■■■ Here, the Sapps requested a limiting instruction which would have prevented the jury from considering the MFA evidence for any purpose other than the award of punitive damages. However, as the trial court properly recognized, this evidence was also relevant to the Sapps' negligence claims.

■■■■ Missouri courts have emphasized the distinctions between negligence and strict liability products liability claims. For example:

> In Missouri, a plaintiff may choose to bring a failure to warn case under a negligence theory pursuant to Section 388 of the Restatement (Second) of Torts, or as an action for strict liability pursuant to Section 402A of the Restatement (Second) of Torts. ***The defendant's standard of care, knowledge and fault are relevant considerations in a negligence claim,*** but under strict tort liability, the defendant may be found liable without regard to his knowledge or conduct.

*Thompson v. Brown & Williamson Tobacco Corp.,* 207 S.W.3d 76, 107 (Mo.App. W.D.2006) (emphasis added; citations omitted). Section 388 of the Restatement (Second) of Torts specifies that a supplier or a chattel may be liable for negligent failure to warn

> if the supplier
>
> a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Quoted in *Thompson,* 207 S.W.3d at 98–99; *see also, e.g., Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 383 (Mo. banc 1986); *Smith v. Brown & Williamson Tobacco Corp.,* 275 S.W.3d 748, 784 (Mo.App. W.D.2008) ("While the defendant's standard of care, knowledge, and fault are relevant considerations in a negligence claim, the defendant may be found liable under a strict liability claim without regard to his knowledge or conduct."); *Spuhl v. Shiley, Inc.,* 795 S.W.2d 573, 577 (Mo.App. E.D.1990).

■■■■ A similar distinction exists between design defect claims based on strict liability versus negligence:

> In negligence cases the duty owed is based on the foreseeable "or reasonable

anticipation that harm or injury is a likely result of acts or omissions." On the other hand, strict liability in tort is based in part on the foreseeable or "reasonably anticipated" *use* of the product, rather than on the reasonably anticipated *harm* the product may cause.

Stated another way, the difference between negligence and strict liability in tort in defective design cases, ". . . is in strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did. The article can have a degree of dangerousness which the law of strict liability will not tolerate even though the actions of the designer were entirely reasonable in view of what he knew at the time he planned and sold the manufactured article."

*Blevins v. Cushman Motors,* 551 S.W.2d 602, 607–08 (Mo. banc 1977) (citations omitted).

We believe that *Lane v. Amsted Industries, Inc.,* 779 S.W.2d 754 (Mo.App. W.D. 1989), on which the Sapps heavily rely, in fact supports the trial court's action. In *Lane,* evidence was admitted at trial concerning American National Standards Institute ("ANSI") standards which placed a burden on employers to install guards on presses like the one by which the plaintiff was injured. The court held that the evidence concerning the ANSI standards was irrelevant to the plaintiff's strict liability design defect claim, because—on the strict liability claim—"fault is not an issue, nor is the state of mind of the defendant"; "[t]he knowledge of the defendant is also irrelevant." *Id.* at 758. On the other hand, the court recognized that the ANSI standards *would* be relevant to plaintiff's punitive damage claim, because "[t]he element of knowledge, irrelevant to the basic strict liability product defect cause of action, is a

required proof for punitive damages liability." *Id.* "Compliance with industry standard and custom impinges to prove that the defendant acted with a nonculpable state of mind—without knowledge of a dangerous design defect—and hence to negate any inference of complete indifference or conscious disregard for the safety of others the proof of punitive damages entails." *Id.* at 759. In these circumstances—where the ANSI standards were irrelevant to defendant's strict liability, but relevant to punitive damages recovery—*Lane* held that a limiting instruction would be warranted. *Id.*

Under *Lane,* evidence that another party was obliged and/or expected to take precautions that may have prevented the plaintiff's injury is relevant to the defendant's fault, and defendant's "knowledge of a dangerous design defect." In this case, where the Sapps submitted negligence design defect and failure to warn claims to the jury, Morrison Brothers' knowledge and fault are relevant not merely to punitive damages, but also to its negligence liability. Further, evidence that Morrison Brothers had experienced no similar incidents at any of the other facilities at which similar vents were installed also may have been relevant to the existence of a defect or dangerous condition in the vents, and to Morrison Brothers' knowledge of any such dangerous condition. *See, e.g., Heitman v. Heartland Reg'l Med. Ctr.,* 251 S.W.3d 372, 376 (Mo.App. W.D.2008) ("Evidence of the absence of prior accidents is relevant to show: (1) absence of a defect or condition; (2) lack of a causal relationship between the injury and the defect or condition charged; (3) nonexistence of an unduly dangerous condition; or (4) lack of knowledge of or grounds to realize the danger"). Finally, Morrison Brothers' actual communications with MFA concerning the potential risks of its vents, and the precautionary measures which could alleviate those risks, were plainly relevant to

the Sapps' claim that Morrison Brothers "failed to use ordinary care to … adequately warn of the risk of harm" presented by the vents, as submitted in the negligence verdict directors.

██ We accordingly conclude that the MFA evidence the Sapps sought to limit *was* relevant to their negligence claims, as well as to punitive damages. Because the Sapps did not request a limiting instruction which recognized the full range of the issues to which the MFA evidence was relevant, they cannot obtain reversal here based on the trial court's refusal to give the limiting instruction they actually tendered. *Cf. Heifner v. Synergy Gas Corp.,* 883 S.W.2d 29, 33–34 (Mo.App. S.D.1994) (finding no abuse of discretion where defendant sought withdrawal instruction eliminating issue from jury's consideration entirely, even though defendant may have been entitled to more narrowly drawn instruction limiting the purposes for which particular evidence could be considered).[8]

## Conclusion

For the foregoing reasons, the judgment is affirmed.

All concur.

---

8. Although the Sapps challenge the trial court's failure to give the limiting instruction they requested, they have not separately argued that Morrison Brothers' use of the MFA evidence in closing argument requires reversal, and we accordingly do not address the issue. *Williams v. McCoy,* 854 S.W.2d 545, 559 n. 9 (Mo.App. S.D.1993) (refusing to consider propriety of defendant's closing argument where Point Relied On referenced only court's failure to deliver limiting instruction).

We recognize that the trial court's ultimate refusal to give the limiting instruction the Sapps requested is in tension with the court's *in limine* ruling concerning the purposes for

which evidence concerning MFA's actions (or inaction) would be admitted. However, because "an order sustaining a motion in limine is merely a preliminary expression of the court's opinion as to the admissibility of the evidence," " '[a]s the course of trial progresses, the trial court retains the power, based on the evidence presented, to admit evidence, if proper, even if it was the subject of a granted motion in limine' "; " '[s]uch change of mind does not automatically work to convict the trial court of error.' " *Littles v. Cummins,* 854 S.W.2d 45, 46 (Mo.App. S.D.1993) (citations omitted).