Greg **MATLOCK, Respondent,**

v.

**ST. JOHN'S CLINIC, INC., Appellant.**

Nos. SD 31398, SD 31438.

Missouri Court of Appeals,
Southern District,
Division Two.

April 3, 2012.

Motion for Rehearing or Transfer
Denied April 24, 2012.

Application for Transfer
Denied July 3, 2012.

Gary R. Cunningham, W. Joseph Reid & Bryan R. Berry, Springfield, MO, for Appellant.

Steve Garner, Chandler Gregg, Springfield, MO, for Respondent.

DANIEL E. SCOTT, Judge.

Greg Matlock lost his medical malpractice case by an 11–to–1 verdict. He sought a new trial, offering juror testimony to support his claims of juror misconduct and nondisclosure. Over objection, the trial court considered the juror testimony and granted relief. We conclude this was error and abuse of discretion. We reverse and remand with instructions to enter judgment on the jury's verdict.

### Background

After the trial, Matlock submitted two juror affidavits, the gist of which follows. During deliberations, jurors began to consider damages before liability was decided. They discussed Matlock's income tax delinquencies and that Matlock could not document income that he received from his friend, Mr. G, who did not testify at trial.[1] During this discussion, Juror C said that, based on his having seen Mr. G "and his group" drinking at a bar, jurors should not trust Mr. G or anyone associated with him. Later, Matlock submitted a third juror affidavit to similar effect.

Appellant ("Defendant") moved to strike the affidavits, citing the so-called Mansfield Rule against jurors impeaching their verdict. The trial court denied that motion, conducted an evidentiary hearing, admitted the affidavits, and took testimony from jurors, including Juror C, all over Defendant's objection. The court ordered a new trial, finding that Juror C committed misconduct during jury deliberations and intentionally concealed information in *voir dire*.

These misconduct and nondisclosure findings, although not wholly unrelated, involve different considerations and are addressed in separate points. We will note additional facts and matters in the context of our analyses below.

### Point I—Jury Misconduct

■ We agree that the trial court abused its discretion in admitting affidavits and testimony about jury deliberations and ordering a new trial based thereon.

*The Mansfield Rule and its Exceptions*

■ Missouri recognizes the Mansfield Rule; *i.e.*, jurors may not impeach their verdict, violate secrets of the jury room, tell of partiality or misconduct that occurred there, or speak to motives that induced or operated to produce the verdict. *See Fleshner v. Pepose Vision Institute*, 304 S.W.3d 81, 87 (Mo. banc 2010); *Strong v. State*, 263 S.W.3d 636, 643 (Mo. banc 2008). As we recently observed in *Ledure v. BNSF Ry. Co.*, 351 S.W.3d 13, 23 (Mo.App.2011), our Missouri Supreme Court has recognized two exceptions—jurors can testify about:

1. Ethnic or religious bias or prejudice expressed during deliberations. *Fleshner*, 304 S.W.3d at 89–90.

2. That a juror independently gathered evidence outside the courtroom. *See*

---

1. The jury heard Matlock's economist testify, without objection, that he had heard that Mr. G was "a convicted felon."

*Travis v. Stone,* 66 S.W.3d 1, 4 (Mo. banc 2002).

*Fleshner* is not implicated here, but Matlock claims *Travis* was violated when Juror C said that he had seen Mr. G in a bar, which Matlock portrays as "extraneous" information from outside the jury room. Our survey of case law, and review of the policy underlying the Mansfield Rule, convince this court otherwise.

### *Travis—Going Out to Gather Evidence*

*Travis* relied on *Stotts v. Meyer,* 822 S.W.2d 887, 890 (Mo.App.1991). Both cases involved jurors who visited accident scenes during trial. *Stotts* held that "visiting the accident scene does not come within the purview of 'matters inherent in the verdict.'" *Id.* Our supreme court followed suit in *Travis,* citing *Stotts* as authority "to elicit testimony about juror misconduct that occurred outside the jury room, such as the alleged gathering of extrinsic evidence at issue here"—*i.e.,* jurors visiting an accident scene. *Travis,* 66 S.W.3d at 4. Since then, our supreme court has reiterated this description of what it calls a "limited exception." *See Storey v. State,* 175 S.W.3d 116 (Mo. banc 2005):

> Although "[t]he rule extends to juror conduct either inside or outside the jury room," *id.,* a limited exception exists. "[I]t is permissible to elicit testimony about juror misconduct that occurred outside the jury room, such as the gathering of extrinsic evidence...." *Travis v. Stone,* 66 S.W.3d 1, 4 (Mo. banc 2002). *Id.* at 130, *quoted in Strong,* 263 S.W.3d at 643–44.

### *McBride Distinguished—Outsiders Injecting Evidence Into Jury Room*

Matlock urges us to read *Travis* more broadly, citing this court's opinion in *McBride v. Farley,* 154 S.W.3d 404 (Mo. App.2004), in which a third party provided prejudicial information to jurors. That was improper, but did not happen in this case. *McBride* is not authority to admit the juror testimony here.

### *Synthesizing Travis and McBride*

That said, our western district recently conjoined *Travis* and *McBride* in restating the "limited exception" this way in *State ex rel. Koster v. McElwain,* 340 S.W.3d 221, 255 (Mo.App.2011):

> Misconduct occurring *outside* the jury room, which would include independent investigation or communications with or coming from third persons, can be established by juror testimony.

(Citations omitted.)[2] This case involves neither of these two evils: (1) no injection into the jury room of extraneous third-party communications, maps, booklets, or the like (*McElwain, McBride, Neighbors* ); and (2) no independent investigation or gathering of extrinsic evidence outside the courtroom (*Travis, Stotts,* etc.).

---

**2.** In *McElwain,* a map "of uncertain nature and description, which was not admitted into evidence," was given to the jury during deliberations. *Id.* at 253.

> The delivery to the jury for their consideration of an exhibit not received in evidence constitutes error. Because a jury's verdict must be based upon evidence presented at trial, it is inappropriate for a juror to view ... extraneous materials [during] the jury's deliberations, even seemingly innocuous materials such as dictionaries and maps. *Id.* at 255 (citations and quotation marks omitted). Similarly, *see Neighbors v. Wolfson,* 926 S.W.2d 35 (Mo.App.1996)(booklet about drug at issue brought into jury room where it was viewed and discussed by jurors); *State v. Cook,* 676 S.W.2d 915 (Mo.App.1984)(witnesses disagreed whether day was rainy or sunny, so juror telephoned a meteorologist). We cited *Neighbors* in *McBride,* 154 S.W.3d at 407.

### Better Parallels—*Ledure* and *Daus*

This case is far more like *Ledure* and *Williams v. Daus*, 114 S.W.3d 351 (Mo. App.2003). The losing plaintiff in *Ledure* alleged that two deliberating jurors provided "extrinsic evidence" outside the trial record, drawn from their personal and employment experience, that the defendant railroad (1) was very safe, (2) would have fixed anything that was wrong, and (3) had very good insurance and obviously had already taken care of the plaintiff. 351 S.W.3d at 22. We found *Travis* inapplicable because it was not claimed that jurors independently gathered evidence outside the courtroom. *Id.* at 23.

In *Ledure*, we were guided by *Daus*, where a deliberating juror allegedly said that the defendant doctor would lose his license and malpractice coverage if he lost the case. This was outside the trial evidence, was based on the juror's purported personal knowledge, and may have affected jury deliberations. Still, we found such evidence inadmissible, and "did so for the reason these statements consisted of matters inherent in the verdict. We also noted that improper motives, reasoning, beliefs or mental operations are matters inherent in the verdict." *Ledure*, 351 S.W.3d at 24 (citing *Williams*, 114 S.W.3d at 368–69 & n. 7).[3]

### A Bigger Picture

Finally, Matlock largely misses the point in urging that jurors' "innermost thoughts" and "mental processes" escaped his examination. To treat *post hoc* parsing of jury deliberations as benign, so long as "innermost thoughts" and "mental processes" are plausibly avoided, is to kill by a

thousand cuts the Mansfield Rule and perhaps the jury trial system as we know it.

Jurors, as humans, are imperfect. It follows that jury deliberations also may be imperfect. Few deliberations, if seined and microscopically examined, might not yield sound bites that skilled advocates could spin to raise *prima facie* doubt about a verdict, leading to evidentiary hearings where the deliberations and verdict itself are put on trial, and jurors being interrogated as to confidential matters which, surely in almost every instance, they undertook and performed in noble public duty and utmost good faith.

" 'The rule is perfectly settled that jurors . . . cannot be allowed to violate the secrets of the jury room, and *tell of any* partiality or *misconduct* that transpired there, *nor* speak of the motives which induced or operated to produce the verdict.' " *Strong*, 263 S.W.3d at 643 (quoting *State v. Babb*, 680 S.W.2d 150, 152 (Mo. banc 1984))(our emphasis). This rests, and always has, "upon the clearest principles of public policy." *State v. Fox*, 79 Mo. 109, 112 (1883). Our supreme court's 19th century warning, *id.*, rings no less true today:

> It is infinitely better that the irregularities, which undoubtedly sometimes occur in the juryroom, should be tolerated rather than to throw open the doors and allow every disappointed party to penetrate its secrets. . . . If this sanctuary were to be thrown open and inquisition held upon the conduct of jurors, and the reasons upon which, individually, their verdict was founded, the trial by jury now held in such sacred regard could not long survive the dishonor to which it would inevitably be exposed.[4]

---

3. It is one thing if a deliberating juror mentions insurance based on her personal experience, and something totally different for an

outsider to inject that subject into the jury room a la *McBride*.

4. Even casual readers may see a parallel with the policy underlying our attorney-client priv-

*Point I Conclusion*

Each affidavit submitted by Matlock failed on its face to implicate *Travis* or another Mansfield Rule exception. The trial court abused its discretion when, based on those affidavits, it took further, similar testimony and granted a new trial based on such evidence. We grant Point I.

## Point II—Juror Nondisclosure

The trial court further erred to Defendant's prejudice in ruling that Juror C intentionally concealed a bias against Mr. G which necessitated a new trial.

### The Threshold Demand— Objective Clarity

■ The threshold issue as to nondisclosure is whether a *voir dire* question was clear and unambiguous. *See Sapp v. Morrison Bros. Co.*, 295 S.W.3d 470, 477 (Mo. App.2009); *McBurney v. Cameron*, 248 S.W.3d 36, 42 (Mo.App.2008); *Keltner v. K–Mart Corp.*, 42 S.W.3d 716, 722–23 (Mo. App.2001). Lawyers know what information they want, and they control the form of their inquiries, so they cannot "take advantage of their own or their opponent's ambiguous questions to impeach a verdict they dislike." *Keltner*, 42 S.W.3d at 723. Jurors are obliged to be truthful, but lawyers must be clear about the information they seek. *Sapp, supra; McBurney, supra.*

■ A nondisclosure claimant bears the burden to prove clarity. The inquiry is objective. If a question *could* reasonably be misunderstood or misinterpreted, the claim fails and inquiry ends. Thus, it is not whether a reasonable juror *could* have known what counsel meant, but that a reasonable juror *would* have known what was meant. *See Sapp*, 295 S.W.3d at 477; *McBurney*, 248 S.W.3d at 42; *Keltner*, 42 S.W.3d at 726.

■ What compels this demanding standard, and makes such exacting proof a necessity, is that "in Missouri's state courts as perhaps nowhere else," nondisclosure claims have become "a powerful weapon in the hands of a verdict loser, plaintiff or defendant...." *Sapp*, 295 S.W.3d at 476–77. In Missouri, "a finding of intentional concealment has 'become tantamount to a *per se* rule mandating a new trial.'" *Brines ex rel. Harlan v. Cibis*, 882 S.W.2d 138, 140 (Mo. banc 1994)(quoting *Williams by Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 37 (Mo. banc 1987)), *quoted in Sapp*, 295 S.W.3d at 477.[5]

■ Indeed, only *after* ruling that a question was clear can a court hear evidence and decide if any nondisclosure was intentional. *Keltner*, 42 S.W.3d at 723. "[N]o legitimate purpose is served by requiring jurors to appear at a post-trial hearing, under a cloud of suspicion, unless the court has already determined that the question the juror allegedly failed to answer *unequivocally triggered* the juror's duty to respond." *Id.* at 722. Further, "it

ilege, which accords to such relationships and the giving of accurate and effective legal advice "greater societal value" than the admissibility of a given piece of evidence in any particular lawsuit. *State ex rel. Great Am. Ins. Co. v. Smith*, 574 S.W.2d 379, 383 (Mo. banc 1978). Indeed, "the heavens will not fall if all relevant and competent evidence cannot be admitted." *Id.*

5. The undisclosed information, of course, must be material. *Cibis*, 882 S.W.2d at 140. *Cibis* held that past litigation experience is material, *id.*, and most reported cases involve such complaints, but not so here. We are skeptical that juror silence, when possible witnesses are listed, is material if such persons (as Mr. G here) never testify. We need not reach that issue given our disposition of the case.

ill serves the judicial system to subject jurors to the embarrassment and inconvenience of a post-trial hearing and thereby add to the reasons so many citizens are reluctant to serve as jurors." *Id.*

### The Proceedings and Errors Here

The trial court did not proceed this way. It did not rule, before or even after hearing post-trial testimony, on the clarity of any *voir dire* question. Instead, the court took juror testimony and decided that Juror C *subjectively* understood that Matlock's counsel had wanted Juror C "to respond as to all persons he knew, knew of, or about whom [Juror C] had information that may effect [*sic* ] his view about" any of the 31 potential witnesses that counsel had listed. This procedure and finding was error to Defendant's prejudice in at least two respects.

■ First, this finding of subjective understanding lacks support in the record. "Second and more importantly, *nothing* that happens at a post-trial hearing will make an unclear question asked during *voir dire* clear." *Keltner,* 42 S.W.3d at 727. *Sapp,* 295 S.W.3d at 477–79, explains at length why courts do not consider *post hoc* subjective interpretations. "The question is either clear or it is not. If it is not, there has been no non-disclosure, intentional or otherwise." *Keltner,* 42 S.W.3d at 727.

### Clarity Reviewed De Novo

■ Although the nondisclosure finding cannot stand on its stated basis, our inquiry does not end because we review *voir dire* questions for clarity *de novo. McBurney,* 248 S.W.3d at 42; *Keltner,* 42 S.W.3d at 723.

■ Matlock focuses on Juror C's silence when the panel was asked if "anyone knows" any of 31 people described as potential witnesses, one of whom was Mr. G. At the post-trial hearing, Juror C explained that "I did not know [Mr. G]. . . . I've never talked to him before, I didn't know him." Juror C testified that he had seen Mr. G's advertisements, knew his line of work, and had seen him in a bar, but "I had never met him. Didn't know him, had no dealings with him or anything like that. Never had a conversation or introduced at all." Matlock offered no contrary testimony *(e.g.,* his own or by Mr. G) and has not claimed that the two men were acquainted with each other.

Knowing someone, and knowing who someone is, may be different things. *See Byers v. Cheng,* 238 S.W.3d 717, 723 (Mo. App.2007)(in rejecting nondisclosure claim, trial judge specifically distinguished knowing a person vs. knowing who a person is).[6] To "know" someone—be it the President, Oprah Winfrey, Tim Tebow, or any of 31 possible trial witnesses—*could* mean, refer to, or be taken as:

- Friendship, business relationship, or mutual personal familiarity.
- Having met or exchanged pleasantries, even if only once.
- Having exchanged letters or emails, or perhaps talked by phone, but never to have met in person.
- To know someone on sight, from media exposure or otherwise.
- To know who someone is, and perhaps a little about the person.
- To recognize the name.

The "anybody knows" question, of itself, was not objectively clear enough to warrant the relief granted here. We next

---

**6.** We cited *Byers* in *Shields v. Freightliner of Joplin, Inc.,* 334 S.W.3d 685, 692 (Mo.App. 2011), a case which, as we have shown, cannot be read for the proposition that all "who knows" questions are clear.

consider whether it was clarified by its context.

### Context Considered

Context can be significant. *See McBurney,* 248 S.W.3d at 43; *Ewing v. Singleton,* 83 S.W.3d 617, 621 (Mo.App.2002). As in *McBurney* and cases it cites, however, (1) Matlock's counsel's earlier questions about knowing people were limited in scope, and (2) there was no "definitive statement broadening the scope of the inquiry." *McBurney,* 248 S.W.3d at 45.[7] For example, inquiries leading up to the question at issue included whether any panelist:

- "knows Greg Matlock, have been involved in any of his business dealings at all or knows him?"

- "any person [*sic*] dealings with Dr. Zablocki or his wife?"

- might "feel uncomfortable if they know somebody or they think they're going to see them again and then you're asked to decide a verdict that may involve their conduct."

- "knows Dr. Zablocki or his wife? Anybody here that is friends with or associates with people that are employed by St. John's Physicians and Clinic?"

- was "friends with or family that works at St. John's Physicians and Clinic or at St. John's network at all?"

- was "related to a medical doctor, somebody in the medical field?"

Then, rather than a "definitive statement broadening" the scope of inquiry, the lead-in to the question under consideration was:

- "I'm going to run through a list of people just to see if anybody knows any of these people because obviously, we don't want you sitting on a jury and say, "Well, that's my cousin or my best friend, or my mortal enemy," whatever the case may be."

Context did not make things so clear that any reasonable juror *would* (not merely could) have known what counsel meant. Since the question *could* reasonably have been misunderstood or misinterpreted, the nondisclosure claim fails and inquiry ends. *See Sapp,* 295 S.W.3d at 477; *McBurney,* 248 S.W.3d at 42; *Keltner,* 42 S.W.3d at 726.

### Point II Conclusion

■■■ No question clearly required Juror C or any panelist "to respond as to all persons he knew, knew of, or about whom [he] had information that may effect [*sic*] his view about" Mr. G or 30 other people, as the trial court found, or otherwise compelled Juror C to speak.[8] Rather, as in *State v. Edmonds,* 188 S.W.3d 119, 122 (Mo.App.2006), we find this nondisclosure claim is not well taken and "simply an

---

**7.** We quote the relevant questioning in the appendix.

**8.** We have considered the "Anybody familiar with any of those names?" question that followed the 31 names, which Matlock raised for the first time at oral argument in this court. We will cite just one of several reasons this does not carry the day for Matlock. Even after getting a *voir dire* transcript, attaching it to a trial court brief, and quoting other parts of it to support his new trial motion, Matlock never cited or mentioned this question in his trial court briefing, or in questioning Juror C

at the post-trial hearing, or in his oral argument to the trial court, or in his proposed findings and conclusions tendered to and adopted by the trial court, or in his appeal brief in this court. We are unwilling to hold disinterested (and, perhaps, occasionally distracted or bored) venirepersons, who hear a seven-word sentence once during 200 total pages of *voir dire,* to a higher standard of perception than a litigant with talented legal representation, a vested interest, and weeks or months to scour a written transcript for advantageous material.

improper attempt to impeach the verdict of the jury." Our observations there also fit this case:

Appellant mistakenly relies upon the testimony of Juror S to claim bias on the part of Juror P. Appellant may not use the testimony of a fellow juror to attack the claimed bias of a juror based upon statements made within the jury room. The rule is perfectly settled, that jurors speak through their verdict, and they cannot be allowed to violate the secrets of the jury room, and tell of any partiality or misconduct that transpired there, nor speak of the motives which induced or operated to produce the verdict. Whether jurors acted on improper motives, reasoning, beliefs, or mental operations are matters inherent in the verdict.

*Id.* at 123 (citations and quotation marks omitted). In *Edmonds,* it was "clear that Appellant's allegations are simply an attack on the motives and bias of Juror P. This, we cannot permit. Juror P was never asked a clear question to which a response was warranted." *Id.* The same can be said here.

█ *Sapp,* 295 S.W.3d at 476–77, suggests that verdicts are imperiled by nondisclosure claims in Missouri "as perhaps nowhere else." If so, a second observation is worth bearing in mind. "Courts should not overturn a jury verdict lightly. Trials are costly—for the litigants, the jurors and taxpayers." *Keltner,* 42 S.W.3d at 722, *quoted in Sapp,* 295 S.W.3d at 476. Point II is granted.

## Conclusion

There will be instances, hopefully rare, when courts must overturn a verdict due to juror misconduct or nondisclosure. This is not such a case. We reverse and remand with instructions to enter judgment on the jury's verdict.[9]

BARNEY, and BATES, JJ., Concurs.

## *APPENDIX*

The relevant *voir dire* questioning by Matlock's counsel follows. We have omitted identification of responding venirepersons, none of whom was Juror C:

The next area is, I need to know whether any of you all know people that are involved in this case or people at St. John's Hospital, may have allegiances through that. Greg Matlock was born in Texarkana ... [TELLS MORE ABOUT HIM]. Anybody feel with that description that you know Greg Matlock, have been involved in any of his business dealings at all or know him? Anybody here? (No response.)

\* \* \*

Now the individual at issue is Dr. Zablocki, the individual doctor, he works for St. John's Physicians and Clinic. He has a wife that's an anesthesiologist as well, Dawn Zablocki. Anybody have any person dealings with Dr. Zablocki or his wife? Yes, sir, Mr.—

VENIREPERSON: Yes.

MR. GARNER: Would you tell us a little bit about your personal dealings with Dr. Zablocki?

VENIREPERSON: Acquaintance from the gym. We talk time to time. I used to train his wife years ago, personal training in the gym.

MR. GARNER: All right. I think you probably know why I ask that. Sometimes people will feel uncomfortable if they know somebody or they think they're going to see them again and then you're asked to decide a verdict that may involve their conduct. Do you

9. Our disposition moots Defendant's other complaints.

think you would be somewhat hesitant knowing that you might see Dr. Zablocki again at the gym?

VENIREPERSON: No.

\*  \*  \*

MR. GARNER: That's the way it ought to be, but obviously some of us if we know somebody, we're going—it's going to be hard for us. Thank you. I appreciate that. Anyone else that knows Dr. Zablocki or his wife? Anybody here that is friends with or associates with people that are employed by St. John's Physicians and Clinic? (No response.)

\*  \*  \*

[I]s there anybody here that is friends with or family that works at St. John's Physicians and Clinic or at St. John's network at all?

\*  \*  \*

I think there were a couple of other hands on people that are friends with St. John's Physicians and Clinic, and employees. Yes, sir, I think it's—is it—?

VENIREPERSON: Yes, sir.

MR. GARNER: Juror No. 39. Who are you acquainted with there?

\*  \*  \*

Anyone else that is—over here that is related to a medical doctor, somebody in the medical field?

\*  \*  \*

Anyone else I didn't talk to that has a relative in the medical profession?

\*  \*  \*

I'm going to run through a list of witnesses that one or either or both parties may call. They may not be called as the case goes on. If the subject that the witness can testify about has already been testified about, we don't call additional witnesses, either party. Both parties are wanting to get the matter submitted as soon as we can.

So I'm going to run through a list of people just to see if anybody knows any of these people because obviously, we don't want you sitting on a jury and say, "Well, that's my cousin or my best friend, or my mortal enemy," whatever the case may be.

[FOLLOWS WITH 31 NAMES, ALPHABETICALLY, THE TENTH OF WHICH WAS "[MR. G], REALTOR"] Anybody familiar with any of those names? I'm sorry, I'm starting to get a runny nose, I apologize for that. Yes, sir.

VENIREPERSON: Realtor, [Mr. G].

MR. GARNER: And how do you know [Mr. G]?

VENIREPERSON: Just through the development business and just casually.

MR. GARNER: All right. Fair enough.

\*  \*  \*

Anybody else that knows people on that list?

\*  \*  \*

There were a couple of other hands about people on that list. Back here. And who on there do you know?

\*  \*  \*

Okay. Anyone else know people on that list?

\*  \*  \*

Anyone else that knows any of the people?