# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00277-CV

**Northeast Neighbors Coalition and TJFA, L.P., Appellants**

**v.**

**Texas Commission on Environmental Quality and
BFI Waste Systems of North America, L.L.C., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-09-004113, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is a suit for judicial review of appellee Texas Commission on Environmental Quality's (TCEQ) order modifying appellee BFI Waste Systems of North America, L.L.C.'s solid-waste-disposal permit. Appellant TJFA, L.P. appeals from the district court's order striking its intervention in the case, and appellant Northeast Neighbors Coalition (NNC) appeals from the district court's judgment that TCEQ's grant of BFI's permit amendment was supported by substantial evidence in the record. We will affirm the district court's judgment.

## BACKGROUND

BFI owns and operates the Sunset Farms landfill in east-central Travis County. The Sunset Farms landfill, which has been permitted as a municipal solid-waste landfill since 1982, covers approximately 350 acres, with a waste-disposal footprint of 250 acres. It is adjacent to the Austin Community landfill operated by Waste Management of Texas and is located in

Austin's "Desired Development Zone."[1] The predominant land use within a mile of the landfill is characterized as "open," but 11% of the use is residential. In fact, appellant NNC's members include persons living in residential developments near the landfill. Appellant TJFA, a real estate investment company, owns property near the landfill.

In late 2005, BFI applied to TCEQ for an amendment to its Sunset Farms permit, seeking to increase the height of allowable waste disposal by 50 to 75 feet—i.e., a vertical expansion of the landfill—and to continue operating the landfill 24 hours per day, seven days per week (24/7).[2] Because TJFA, NNC, and other parties, including the City of Austin, opposed BFI's proposed permit amendment and requested contested-case hearings on the matter, TCEQ referred the matter to the State Office of Administrative Hearings. After conducting the contested-case hearing, the administrative law judge (ALJ) recommended that TCEQ approve BFI's application.[3] TCEQ ultimately adopted the ALJ's recommendations and issued an order in September 2009 granting BFI's application for vertical expansion.[4]

---

[1] "Desired Development Zone" is an area that City of Austin planners have designated as the most appropriate and preferred location for growth.

[2] The height limit under the 1982 permit was 720 feet. The 2006 amendment sought a maximum height of 770 feet for the eastern part of the landfill and 795 feet for the western part.

[3] Initially, the ALJ's proposal for decision rejected BFI's request to operate 24/7, but after deciding that the burden of proof on this issue was on the permit opponents, the ALJ amended its PFD to allow BFI to operate 24/7. TCEQ ultimately determined that while the ALJ was incorrect as to the burden of proof, BFI had produced sufficient evidence supporting 24/7 operations and approved the permit accordingly.

[4] During the pendency of the administrative proceedings, but before the contested-case hearing, BFI and the City of Austin entered into a settlement agreement that required BFI to implement certain erosion and sedimentation controls that exceeded TCEQ regulatory requirements and to stop accepting waste at the Sunset Farms facility after November 1, 2015. BFI also agreed

Shortly after TCEQ granted BFI's permit expansion, NNC and TJFA filed separate suits in Travis County district court seeking judicial review of TCEQ's order on various issues. But while NNC executed service of citation of its suit on TCEQ within 30 days of filing suit as required by statute, TJFA did not execute service of its citation on TCEQ until 41 days after it filed suit. *See* Tex. Health & Safety Code Ann. § 361.321(c) (West 2010) (providing that in suit for judicial review of TCEQ decision, "[s]ervice of citation must be accomplished not later than the 30th day after the date on which the petition is filed"). As a result, TCEQ filed a plea to the jurisdiction in TJFA's suit, arguing that this statutory service requirement is a jurisdictional prerequisite to suit that results in dismissal for failure to comply. Ultimately, the district court granted TCEQ's plea to the jurisdiction and dismissed TJFA's case for lack of jurisdiction, finding that the 30–day deadline for executing service of citation was a jurisdictional prerequisite to suit and, alternatively, dismissing TJFA's case on non-jurisdictional grounds based on its determination that the 30-day, statutory deadline was "mandatory, not directory." *See, e.g.*, *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (discussing mandatory versus directory statutory language and consequences of such designations). In TJFA's appeal of that decision to this Court, we affirmed the district court's dismissal on the ground that, while TJFA's failure to timely execute service was not a jurisdictional bar to suit, it did require mandatory dismissal of TJFA's case. *See TJFA, L.P. v. Texas Comm'n on Envtl. Quality*, 368 S.W.3d 272, 730–39 (Tex. App.—Austin 2012, pet. denied) (*TJFA*).

Before the district court had granted TCEQ's plea to the jurisdiction, however, TJFA filed a pleading in NNC's case that sought to consolidate the two causes or, in the alternative, to

that it would not use the Sunset Farms landfill site as a transfer station. TCEQ included these settlement terms in its final permit.

allow TJFA to intervene in NNC's suit for judicial review. While acknowledging that consolidation would be proper if TJFA's separate suit survived TCEQ's plea to the jurisdiction, BFI opposed TJFA's intervention in the event that it did not survive, arguing that TJFA should not be allowed to intervene in NNC's case if TJFA's own case was dismissed for failure to timely execute service on TCEQ. After a hearing on the matter, which took place after the district court granted TCEQ's plea to the jurisdiction and dismissed TJFA's separate case, the district court granted BFI's motion to strike TJFA's intervention, finding that TJFA's failure to comply with the statutory service requirements in its case also barred it from challenging TCEQ's order through intervention in NNC's case. Thereafter, NNC's case proceeded to trial, with the district court ultimately finding that TCEQ's decision to grant the permit was supported by substantial evidence and affirming TCEQ's order. It is from this judgment that both TJFA and NNC appeal.

## TJFA

In two issues, TJFA challenges the district court's interlocutory order striking its intervention in this case.[5] The first issue stems, in part, from our holding in *TJFA* that TJFA's failure to timely execute service of process, while requiring dismissal of TJFA's suit, did not deprive the district court of subject-matter jurisdiction over TJFA's case. *See TJFA*, 368 S.W.3d at 733–39. TJFA argues that, as a result of this holding in *TJFA*, we must reverse and remand for a new hearing the district court's order striking TJFA's intervention in this case because, TJFA argues, that order

---

[5] Because TJFA's briefing in this matter was completed before we issued our holding in *TJFA, L.P. v. Texas Comm'n on Envtl. Quality*, 368 S.W.3d 727 (Tex. App.—Austin 2012, pet. denied) (*TJFA*), TJFA frames its appellate issues as being in the alternative depending on the outcome of that case. Consequently, TJFA's issues here that depend on an alternate outcome in *TJFA* have been mooted. Accordingly, we have framed TJFA's issues in this opinion in a manner that takes into account our decision in *TJFA*.

4

was based solely on the district court's erroneous determination that it lacked subject-matter jurisdiction over TJFA's separate case as a result of TJFA's failure to timely execute service. In its second issue, TJFA asserts that the district court abused its discretion in striking TJFA's intervention.

**Standard of review**

As we have previously noted, the right of intervention is rooted in equity. *See Zeifman v. Michels*, 229 S.W.3d 460, 465 (Tex. App.—Austin 2007, no pet.) (citing *Highlands Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 794 S.W.2d 600, 601 (Tex. App.—Austin 1990, no writ) ("The right of intervention is an equitable right. It does not depend upon a rule or statute for its existence.")). This right is recognized in rule 60 of the Texas Rules of Civil Procedure: "Any party may intervene by filing a pleading, subject to being stricken by the court for sufficient cause on the motion of any party." *See* Tex. R. Civ. P. 60; *Zeifman*, 229 S.W.3d at 465; *Highlands*, 794 S.W.2d at 601–02.

Sufficient cause exists for striking an intervention when a would-be intervenor faced with a motion to strike cannot demonstrate a justiciable interest in the lawsuit. *Zeifman*, 229 S.W.3d at 464 (citing *Mendez v. Brewer*, 626 S.W.2d 498, 499–500 (Tex. 1982); *Law Offices of Windle Turley, P.C. v. Ghiasinejad*, 109 S.W.3d 68, 70 (Tex. App.—Fort Worth 2003, no pet.); *McCord v. Watts*, 777 S.W.2d 809, 812 (Tex. App.—Austin 1989, no writ)). This justiciable interest may be either legal or equitable in nature, but must be present and not merely remote or contingent. *Id.* (citing *Mendez*, 626 S.W.2d at 499; *McCord*, 777 S.W.2d at 811–12 ("An intervenor must show some present legal or equitable interest in the subject matter which makes it proper for him to participate in the proceedings.")). This interest is "analogous to that essential for a party to maintain

5

or defend an action." *McCord*, 777 S.W.2d at 811–12; *see also Turley*, 109 S.W.3d at 70 ("A party has a justiciable interest in a lawsuit, and thus a right to intervene, when his interests will be affected by the litigation."). Whether an intervenor possesses a present justiciable interest is determined, in the first instance, by the facts alleged in the petition in intervention, which "also should be construed along with the allegations of fact set forth in the pleadings of the other parties." *Zeifman*, 229 S.W.3d at 464 (citing *McCord*, 777 S.W.2d at 812).

While the determination of whether a justiciable interest exists based on the pleadings would appear to present a pure question of law, *cf. Texas Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004), the ultimate determination of whether an intervention should be struck, even if a justiciable interest is shown, has long been held to be vested in the sound discretion of the trial court. *Zeifman*, 229 S.W.3d at 465 (citing *Mendez*, 626 S.W.2d at 499 ("It is settled law that a motion to strike an intervention is addressed to the sound discretion of the trial court."); *Turley*, 109 S.W.3d at 70; *McCord*, 777 S.W.2d at 812). We accordingly review a trial court's decision on a motion to strike an intervention for an abuse of discretion. *See In re Lumbermen's Mut. Cas. Co.*, 184 S.W.3d 718, 722 (Tex. 2006) (citing *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990)). An abuse of discretion denotes "act[ing] without reference to guiding rules or principles; in other words . . . the act was arbitrary or unreasonable." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

**Order striking intervention**

TJFA argues first that the district court's decision to strike TJFA's intervention was an abuse of discretion because that order was based on the court's erroneous legal conclusion that it lacked jurisdiction over TJFA's claims as a result of TJFA's failure to timely execute service

6

on TCEQ as required by the health and safety code.  Based on our recent holding in *TJFA* that section 361.321's service requirement is not jurisdictional, we agree here that it would be an abuse of discretion for the district court to strike TJFA's intervention on the grounds that it lacked jurisdiction due to TJFA's service failure.  *See In re United Scaffolding, Inc.*, 301 S.W.3d 661, 663 (Tex. 2010) (holding that "an erroneous legal conclusion is an abuse of discretion") (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).  But the district court's order here provides another basis for striking the TJFA's intervention:

> Since TJFA's suit was dismissed because of TJFA's failure to comply with the statutory prerequisite to suit, TJFA cannot now challenge the TCEQ order by intervening in this lawsuit **and** TJFA does not otherwise meet the test for intervention.

(Emphasis added.)  In other words, the district court struck TJFA's intervention because it found that (1) TJFA had failed to meet statutory prerequisites to suit, which it determined deprived the court of jurisdiction, and (2) TJFA did not otherwise meet the requirements for intervention.  Thus, even though the first ground is legally incorrect in light of our ruling in *TJFA*, we must nevertheless affirm the order if the district court's alternative ground for striking the intervention was not an abuse discretion.  *See* Tex. R. Civ. P. 60 ("Any party may intervene by filing a pleading, subject to being stricken out by the court *for sufficient cause* on the motion of any party.") (emphasis added).

TJFA suggests in its briefing that we cannot rely on the district court's second ground, or any other ground for that matter, because BFI raised only the jurisdictional ground in its motion to strike.  We disagree.  As emphasized above, a trial court has broad discretion in determining whether to strike an intervention.  *See Guaranty*, 793 S.W.2d at 657.  Presumably, that broad discretion would include consideration of all issues related to whether intervention was proper in the case under

the circumstances—i.e., for any sufficient cause. *See* Tex. R. Civ. P. 60. Further, unlike the rules for summary judgment, which require that a motion for summary judgment "expressly present the grounds upon which it is made, and must stand or fall on these grounds alone," *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997) (citing Tex. R. Civ. P. 166(a)(c) ("The motion for summary judgment shall state the specific grounds therefor.")), rule 60 merely requires the party opposing the intervention to challenge the intervention by filing a motion to strike, *see* Tex. R. Civ. P. 60; *Guaranty*, 793 S.W.2d at 657 (holding that party opposed to intervention has the burden to challenge with motion to strike, and that trial court abuses its discretion if it strikes intervention in the absence of a motion to strike). And also unlike summary judgment motions, once a motion to strike is filed, the burden is on the intervenor, not the movant, to show that intervention is proper.

We overrule TJFA's first issue on appeal.

**Grounds for intervention**

In its second issue, TJFA argues that even if its separate lawsuit was properly dismissed, it still has a justiciable interest in NNC's suit that makes its intervention in this case proper. TJFA asserts that it has a justiciable interest in this litigation because "if [NNC's separate] action had never been commenced, and [TJFA] had first brought it as the sole plaintiff, [TJFA] would have been entitled to recover in [its] own name." *See In re Union Carbide Corp.*, 273 S.W.3d 152, 155 (Tex. 2008) ("To constitute a justiciable interest, '[t]he intervenor's interest must be such that if the original action had never been commenced, and he had first brought it as the sole plaintiff, he would have been entitled to recover in his own name to the extent at least of a part of the relief sought' in the original suit." (quoting *King v. Olds*, 12 S.W. 65, 65 (Tex. 1888)). TJFA points out that not only could it have brought its own suit as the sole plaintiff, it actually did so. The fact that

8

we subsequently determined that TJFA's separate case had to be dismissed for failure to meet statutory service requirements does not eliminate its justiciable interest, TJFA argues, because justiciable interests can exist even if there is a procedural obstacle to the intervenor filing its own lawsuit. *See, e.g.*, *Antonov v. Walters*, 168 S.W.3d 901, 906–07 (Tex. App.—Fort Worth 2005, pet. denied) (holding that trustee retained justiciable interest in litigation even though his claims were barred by limitations because the trustee's intervention in the suit related back to the timely-filed suit) (citing *Franks v. Sematech, Inc.*, 936 S.W.2d 959, 960 (Tex. 1997)).

The cases relied upon by TJFA in support of its argument are distinguishable. Both *Antonov* and *Franks* involved statute of limitations issues in personal injury claims, not statutory service requirements for government defendants that result in mandatory dismissal if not met. Also, each involved a personal-injury claim that the respective courts characterized as giving rise to only one cause of action that belonged to one person, although in which other parties had an interest. *See Antonov*, 168 S.W.3d at 905; *Franks*, 936 S.W.2d at 960. Here, in contrast, although both NNC's and TJFA's suits involve judicial review of an agency decision, TJFA brings additional claims not brought by NNC. That fact, coupled with the mandatory dismissal of TJFA's suit, suggests that, at the very least, what we have here is more than a "procedural bar" to TJFA bringing its own suit.

But assuming without deciding that TJFA has a justiciable interest in NNC's case that was not otherwise eliminated by the mandatory dismissal, the district court nevertheless had the discretion to strike the intervention on other grounds: "[T]he ultimate determination of whether an intervention should be struck, *even if a justiciable interest is shown*, has long been held to be vested in the sound discretion of the trial court." *Zeifman*, 229 S.W.3d at 465 (emphasis added). In other words, a trial court may decide to strike the intervention of a party who has a justiciable interest

9

in the case for other reasons, as long as the court's action in doing so is not arbitrary or unreasonable—i.e., an abuse of discretion. *See id.* In the present case, it appears from the reporter's record that the district court, in addition to its jurisdictional questions, was concerned with the equity of allowing a party whose claims against TCEQ were otherwise statutorily barred to nevertheless proceed with those claims by intervening in another party's case. *See id.* (noting that the right of intervention is an equitable right). Certainly, having failed to preserve its own right to proceed against TCEQ, TJFA could not argue that equity was in its favor. *Cf. Miers v. Brouse*, 271 S.W.2d 419, 421 (Tex. 1954) (noting that the "first maxim of equity is that it will not suffer a right to be without a remedy"). Further, as will be discussed in more detail below, TJFA's intervention would add several additional issues not brought by NNC. For these reasons, we cannot say that the district court abused its discretion in striking TJFA's intervention.

TJFA argues that the district court had no discretion to strike its intervention because TJFA's intervention meets the three-part *Guaranty* test created by the Texas Supreme Court. *See Guaranty*, 793 S.W.2d at 657. In *Guaranty*, the supreme court held that it was an abuse of discretion for a trial court to strike a plea in intervention if all of the following factors were met: (1) the intervenor has a justiciable interest in the case—i.e., the intervenor could have brought the same action in his own name—(2) the intervention will not complicate the case by an excessive multiplication of the issues, and (3) the intervention is almost essential to effectively protect the intervenor's interest. *See id.* In other words, an intervenor who meets all of these three factors is entitled to intervene in a case as a matter law. *See id.* TJFA argues that, in addition to having a justiciable interest, its intervention will not complicate the case because it is an administrative appeal determined on the basis of a fixed record and preserved issues, and that its intervention is essential

10

to protect TJFA's interests because, as a result of the mandatory dismissal of its separate case, NNC's case is the only remaining judicial avenue for this particular administrative order by TCEQ; therefore, TJFA argues, it was an abuse of discretion for the trial court to strike its intervention. We disagree that TJFA meets all the *Guaranty* tests.

First, and again assuming without deciding that TJFA retains a justiciable interest in NNC's case, we do not agree that TJFA's intervention would not have "complicated the case by an excessive multiplication of the issues." NNC's petition in the district court asserted three issues that it had preserved at the administrative level. TJFA's petition in intervention, in contrast, asserted at least eleven separate issues, some of which included sub-issues. Given that disparity, we cannot say that the district court would abuse its discretion here if it determined that TJFA's intervention would have multiplied the issues and excessively complicated the case.

Finally, we do not agree that "intervention is almost essential to effectively protect the intervenor's interest." *See id.* TJFA itself created the need to intervene in NNC's case by failing to timely execute service in its separately filed case. Had it timely executed service as required, intervention would not have been necessary. Stated another way, TJFA created the problem from which it needs protection. Considering, again, the equitable nature of intervention, we cannot say that this is the type of "necessity" that the supreme court envisioned in *Guaranty*.

We overrule TJFA's second and final issue on appeal.

**Northeast Neighbors Coalition**

NNC challenges the district court's judgment affirming TCEQ's grant of a permit amendment to BFI in what it describes as four issues, but what are more accurately characterized as one assertion regarding the proper standard of review in this case and three issues challenging

11

whether the agency decision here is supported by substantial evidence. Specifically, NNC argues

(1) that the substantial-evidence standard of review for agency decisions requires an examination

of the actual content of evidence rather than just the volume of evidence submitted. It then asserts

that (2) TCEQ's findings of land-use compatibility; (3) TCEQ's approval of 24/7 landfill operations;

and (4) TCEQ's finding of "no substantial alteration of natural drainage patterns" are not supported

by substantial evidence.

**Standard of review**

Section 2001.174 of the Administrative Procedures Act (APA) governs our review

of TCEQ's order:

> A court may not substitute its judgment for the judgment of the state agency on the
> weight of the evidence on questions committed to agency discretion but:
>
> (1)    may affirm the agency decision in whole or in part; and
>
> (2)    shall reverse or remand the case for further proceedings if substantial rights
> of the appellant have been prejudiced because the administrative findings,
> inferences, conclusions, or decisions are:
>
>> (A)    in violation of a constitutional or statutory provision;
>>
>> (B)    in excess of the agency's statutory authority;
>>
>> (C)    made through unlawful procedure;
>>
>> (D)    affected by other error of law;
>>
>> (E)    not reasonably supported by substantial evidence considering the
>> reliable and probative evidence in the record as a whole; or
>>
>> (F)    arbitrary or capricious or characterized by abuse of discretion or
>> clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174 (West 2008). "Substantial evidence," in the sense that it is used in subpart (2)(E), is essentially a rational-basis test whereby courts determine, as a matter of law, whether an agency's order finds reasonable factual support in the record. *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 813 (Tex. App.—Austin 2011, pet. granted) (op. on reh'g) (citing *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984)). We consider whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Id.* (citing *Collins v. Texas Natural Res. Comm'n*, 94 S.W.3d 876, 881 (Tex. App.—Austin 2002, no pet.)). The issue is not whether the agency reached the correct conclusion, but rather whether there is some reasonable basis in the record for its action. *Id.* (citing *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994)). Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *City of El Paso*, 883 S.W.2d at 185. We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to prove otherwise. *City of Waco*, 346 S.W.3d at 813; *Collins*, 94 S.W.3d at 881.

With regard to NNC's argument regarding the type of evidence necessary to support a substantial-evidence inquiry, we emphasize that section 2001.174(2)(E) limits our consideration to the "*reliable and probative* evidence in the record as a whole." *See* Tex. Gov't Code Ann. § 2001.174(2)(E) (emphasis added); *Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.). The APA provides that the rules of evidence apply to a contested case. *See* Tex. Gov't Code Ann. § 2001.081 (West 2008). The APA also requires that "evidence that is irrelevant, immaterial, or unduly repetitious" be excluded from the record of a

contested-case hearing. *Id.* § 2001.082 (West 2008). Accordingly, the APA itself answers NNC's

question of whether the substantial-evidence standard of review requires examination of the actual

content of evidence, and that answer is clearly yes.

**Land-use compatibility**

In its second issue on appeal, NNC challenges TCEQ's conclusion that the proposed

vertical expansion of the Sunset Farms landfill would be compatible with surrounding land uses,

arguing that this conclusion is not supported by the substantial evidence in the administrative record

because of continuing odor issues with the landfill and problems with BFI's expert evidence.

*TCEQ regulations regarding land use*

The Solid Waste Disposal Act (SWDA)[6] allows TCEQ, for good cause, to deny a

municipal solid-waste (MSW) permit for reasons pertaining to, among others, land use:

> The commission may, for good cause, deny or amend a permit it issues or has
> authority to issue for reasons pertaining to public health, air or water pollution, or
> land use, or for having a compliance history that is classified as unsatisfactory
> according to commission standards under Sections 5.753 and 5.754, Water Code, and
> rules adopted and procedures developed under those sections.

Tex. Health & Safety Code Ann. § 361.089 (West Supp. 2012); *see* 30 Tex. Admin. Code

§ 305.66(c) (2005) (Tex. Comm'n Envtl. Quality, Permit Denial, Suspension, and Revocation)

---

[6] The Solid Waste Disposal Act (SWDA) is codified in Chapter 316 of the Texas Health &
Safety Code. *See* Tex. Health & Safety Code Ann. §§ 361.001–.992 (West 2010 & Supp. 2012).

14

(authority to deny).[7]  Relatedly, section 361.069 gives TCEQ the discretion to make a separate determination on the question of land-use compatibility in processing a permit application:

> The commission in its discretion may, in processing a permit application, make a separate determination on the question of land use compatibility, and, if the site location is acceptable, may at another time consider other technical matters concerning the application.  A public hearing may be held for each determination in accordance with Section 361.088.  In making a determination on the question of land use compatibility, the commission shall not consider the position of a state or federal agency unless the position is fully supported by credible evidence from that agency during the public hearing.

Tex. Health & Safety Code Ann. § 361.069 (West 2010); *see* 30 Tex. Admin. Code § 330.61 (2005) (Tex. Comm'n Envtl. Quality, Land-Use Public Hearing).  The SWDA does not, however, define "land use" or "land use compatibility."  *See* Tex. Health & Safety Code Ann. §§ 361.001–.992 (West 2010 & Supp. 2012).

In promulgating rules to enforce the SWDA, including the above provisions regarding land-use compatibility, TCEQ requires municipal solid-waste (MSW) permit applicants to include in their permit applications a land-use map—

> showing the boundary of the property and any existing zoning on or surrounding the property and actual uses (e.g., agricultural, industrial, residential, etc.) both within the site and within one mile of the site.  The applicant shall make every effort to show the location of residences, commercial establishments, schools, licensed child care facilities, churches, cemeteries, ponds or lakes, and recreational areas within one mile of the site boundary.  Drainage, pipeline, and utility easements within the site shall be shown. Access roads serving the site shall also be shown.

---

[7]  The parties agree that the TCEQ regulations in effect prior to 2006 amendments to those rules are the regulations that govern our disposition of that case.  Accordingly, all references to the Texas Administrative Code will be to the version in effect in 2005.

15

30 Tex. Admin. Code § 330.53(b)(7) (2005) (Tex. Comm'n Envtl. Quality, Technical Requirements of Part II of Application). That same rule then provides a framework for TCEQ's analysis of land-use compatibility:

> (8)   A primary concern [regarding land use] is that the use of any land for an MSW site not adversely impact human health or the environment. The impact of the site upon a city, community, group of property owners, or individuals must be considered in terms of compatibility of land use, zoning in the vicinity, community growth patterns, and other factors associated with the public interest. To assist the executive director in evaluating the impact of the site on the surrounding area, the applicant shall provide the following:
>
> > (A)   zoning at the site and in the vicinity. If the site requires approval as a nonconforming use or a special permit from the local government having jurisdiction, a copy of such approval shall be submitted;
> >
> > (B)   character of surrounding land uses within one mile of the proposed facility;
> >
> > (C)   growth trends of the nearest community with directions of major development;
> >
> > (D)   proximity to residences and other uses (e.g., schools, churches, cemeteries, historic structures and sites, archaeologically significant sites, sites having exceptional aesthetic quality, etc.). Give the approximate number of residences and business establishments within one mile of the proposed facility including the distances and directions to the nearest residences and businesses; and
> >
> > (E)   description and discussion of all known wells within 500 feet of the proposed site.

*Id*. § 330.53(b)(8). Thus, although neither the act nor the regulations define compatibility or provide a specific standard by which to determine compatibility, the regulations do emphasize that the primary concern in this inquiry is "that the use of any land for an MSW site not adversely impact human health or the environment." *See id.*; *see also* Tex. Local Gov't Code Ann. § 241.003

16

(West 2005) (defining "compatible land use" as use that "does not endanger the health, safety, or welfare of the owners, occupants, or users of the [adjacent] land" in connection with the Airport Zoning Act). But they also seem to give TCEQ the discretion to consider land use-compatibility issues that go beyond health and environmental concerns. *See Merriam Webster's Collegiate Dictionary* 253 (11th ed. 2008) (defining "compatible" as "existing together in harmony"); *see also* 16 U.S.C. § 668ee (defining "compatible" as "not materially interfering with or detracting from"). Thus, under the plain language of the SWDA, TCEQ *may* deny an MSW permit for good cause related to land use and *may*, in its discretion, conduct such an inquiry separately from the other aspects of the permitting process, but it is not required to do either. *See* Tex. Health & Safety Code Ann. §§ 361.089, .069. MSW permit applicants, however, must provide TCEQ with the information needed to make a determination of land-use compatibility. *See* 30 Tex. Admin. Code §§ 330.61, .53. Once made, however, a land-use-compatibility decision is subject to the substantial-evidence review described above, keeping in mind that we will presume that TCEQ's decision is supported by the substantial evidence unless NNC proves otherwise. *See Charter Med.–Dallas*, 665 S.W.2d at 453. Thus, in reviewing TCEQ's decision here, we must determine whether there is substantial evidence in the administrative record to support TCEQ's conclusion that the landfill will be compatible with existing land uses.

### *Offensive odors*

NNC focuses its first land-use argument on the existence of an alleged ongoing odor problem at the landfill. During the contested-case hearing, NNC offered the testimony of several landfill neighbors who, generally stated, testified that they can sometimes smell the landfill in the vicinity of the landfill. Most of the neighbors described the smell as "rotting garbage," while others

17

used more descriptive phrases. Three of the neighbors testified that the smells sometimes made them sick or nauseated. Some of these same neighbors testified that they thought the instances of odors from the landfill were increasing, while another thought that the frequency of the odors had been decreasing. NNC asserts that this testimony was unrebutted by BFI and, therefore, conclusively established that the landfill had "continuing, systematic, and disruptive odor problems" such that TCEQ was precluded from finding the landfill compatible with existing land use. We disagree.

First, the neighbors' testimony does not establish that the landfill has "continuing, systematic, and disruptive odor problems." At best, their testimony can be said to establish only that some of the neighbors, depending on the wind and other weather-related factors, can occasionally smell offensive odors from the landfill and that, on those occasions, the odors make some of the neighbors ill or nauseated. And while the testimony may establish that the odors are continuing in the sense that they sometimes occur in the present, the neighbors' testimony does not conclusively establish that the "odor problem" is systematic—i.e., regular or methodical—or that it is disruptive.

Second, the record does not support NNC's assertion that the neighbors' testimony regarding odors was unrebutted. BFI submitted evidence showing that, although the landfill had experienced odor problems several years ago that prompted complaints from neighbors, it has since taken steps to control the odors and, as a result, the odors have declined to low levels in more recent years and have not been extreme since. For example, Brad Dugas, a vice president of BFI's parent company, testified that in addition to its overall odor-management plan implemented at the landfill, BFI keeps the working face of the landfill small and appropriately covered, its gate operators provide additional care to "odorous loads," and its operations manager patrols the landfill perimeter daily to assess odor conditions in the area. Regarding odor complaints concerning the Sunset Farms landfill,

18

Dugas explained that the Austin area experienced a large rainfall event in November 2001 that created an odor problem at the landfill. He explained that before the rainfall event, both BFI and the neighboring Waste Management facility had been accepting "significant amounts of construction and demolition waste, which contains wallboard." Wallboard, he explained further, generates hydrogen sulfide when it decays, which smells like rotten eggs. These factors led to a surge in the production of landfill gas containing hydrogen sulfide at the landfills, which in turn caused an odor problem in the area. Dugas testified that, as a result of this odor problem, BFI hired a consultant and expanded its gas collection and control system (GCCS) to remedy problems caused by landfill gas. Dugas also testified that TCEQ issued notices of violation against both landfills in the vicinity and began an investigation of those landfills during this same period. Specifically, TCEQ performed a week-long, 24-hour-per-day investigation of odors at the site. Dugas explained that although TCEQ's investigation did not document or note any odor violations, BFI agreed to pay an administrative penalty. He also stated that although odor complaints have not stopped completely, the improvements to the GCCS have been "very effective in reducing odor and complaints about odors fell off over the following months." Specifically, Dugas testified, "Since approximately 2003, odor complaints to the TCEQ and Travis County have dropped from a peak of hundreds in 2002 down to an average of around four per month until 2008 when, through August 8th, there had been a total of nine complaints." Finally, Dugas testified that it was his belief that vertical expansion of the landfill would not have an impact on the landfill's ability to prevent odors from becoming a nuisance.

BFI also offered the expert testimony of Matt Stutz, a civil/environmental engineer who designed the GCCS expansion at the Sunset Farms landfill after the 2001-2002 odor problems.

Stutz testified regarding the landfill's monitoring system and expansions, including the causes of the 2001-2002 odor problems and the need for expanding the GCCS. He testified that by the fall of 2003, the GCCS at the landfill was operating at the optimal level for its intended purpose, including odor control. He noted that it was his personal observation that the installation of the new GCCS in 2003 resolved the odor problems. He also testified that increasing the height of the landfill would not cause any more or less odor and that the implementation of the GCCS for the new permit would reduce the potential for odors from the landfill. Finally, he explained that it was his opinion that the GCCS satisfied solid-waste regulations.

BFI also offered the expert testimony of Dr. Shari Libicki—a chemical engineer who consults on numerous landfill air quality assessments and teaches environmental policy and regulations at Stanford University. She testified that she had reviewed the more than 900 odor complaints made during the period between 2001 and 2008 and the investigation reports covering the same period by TCEQ and a private firm. The landfill received its highest number of odor complaints during 2001 through 2003, a fact she attributed to the 2001-2002 odor problems discussed above. Specifically, she testified that of the six major causes of landfill odors,[8] landfill gas was the most likely cause of odor complaints near the Sunset Farms landfill during that 2001-2003 period, which could be attributed to the rainfall event and the acceptance of construction waste. She then explained that, based on the decrease in odor complaints in the area since BFI improved the GCCS, it was her opinion that those improvements had controlled and are preventing the

_____

[8] According to Dr. Libicki's testimony, the six major sources of landfill odors are: (1) arriving waste-haul trucks, (2) disturbed green waste/composting piles, (3) the landfill's working face where active disposal operations are occurring, (4) leachate collection/treatment systems, (5) cracks in capped cells, and (6) leaking gas wells and gas collection systems that have poor coverage or not operating properly.

20

recurrence of severe odors at the landfill.[9] She also referenced a newspaper article that reported, "Commissioners, residents who live near the landfills and officials with [TCEQ], which regulates landfills, all say the odor problem has improved" since 2002. She also testified about how the history of exposure and annoyance can have an impact on odor sensitivity, explaining that someone who has experienced odors in the past is likely to be more sensitive to those odors in the future, while newcomers to the area may not notice the odors.

Regarding current conditions at the landfill, Dr. Libicki testified that BFI conducts daily inspections at the landfill that include examination of odor conditions. She testified about the monitoring systems at the landfill that would monitor potential odor problems and also that several of the major contributors of odor problems were not present at the Sunset Farms landfill. In conclusion, she testified that the increased height of the landfill would not cause any additional odor problems at the Sunset Farms landfill. Finally, she testified that it was her opinion that BFI's application contained adequate provisions for odor control, that it would not create odors adverse to human health, safety, or welfare, and that it would be protective of human health and the environment.

In addition to Dr. Libicki's testimony, BFI offered into evidence the TCEQ strike-team report regarding its December 2002 week-long investigation of the odor problems in the

---

[9] Specifically, she testified that of the 939 complaints made, 776 were reported between December 2001 and September 2003, with the highest day being February 22, 2002 with 37 complaints. From September 2003 through February 2008, 157 odor complaints were reported, with no more than four reported on any single day. NNC contends that the decrease in complaints after 2003 happened because, as one of its witnesses testified, the neighbors were frustrated by TCEQ's failure to act on those complaints. But the testimony and documentary evidence, as concluded by the ALJ, show that TCEQ quickly responded to odor complaints, even on nights and weekends.

21

landfill. TCEQ set up monitoring systems to sample the air and categorized those samples on a scale from one to five. Category one indicates that no odor was detected; category two and three are odors that are barely detectable or noticeable, but not unpleasant; category four odors are light to moderate or strong but intermittent and not of sufficient duration to be objectionable; and category five odors are capable of causing health effects, are highly objectionable, and can have an impact on the use of property. Of the 409 samples taken, 49% were determined to be category one, 41% were category two or three, and 10% were category four, with the majority of those occurring at the BFI fence line. No category five odors were observed. Finally, BFI offered evidence of the fact that, in its 26 years of operation, it had received only one odor-related notice of violation from TCEQ and that was in April 2001 before it made the changes to the GCCS.

Based on the evidence in the record, we cannot say that the neighbors' testimony regarding odors was completely unrebutted. But more important, there is substantial evidence in the record that supports TCEQ's conclusion that the landfill is compatible with existing land uses. Even if we were to assume, however, that the neighbors' odor testimony is conclusive—i.e., the landfill continues to have a significant odor problem that is systematic and disruptive—that fact alone would not preclude TCEQ from concluding that the landfill was compatible with existing land use in the area. First, as the ALJ indicated, there is no rule that prohibits a landfill from producing any odor; rather, TCEQ rules simply require an applicant to control odors, *see, e.g.*, 30 Tex. Admin. Code § 330.125(b) (2005) (Tex. Comm'n on Envtl. Quality, Air Criteria) (requiring landfill to have an odor management plan that addresses the sources of odors and includes instructions on how to control odors or sources of odors). As delineated above, there is substantial evidence in the record

supporting TCEQ's conclusion that BFI has an odor management plan that addresses the sources of odors and that controls the odors at the landfill.

The issue NNC puts before us here, however, is not whether there is substantial evidence to support TCEQ's odor-control decision. Instead, NNC challenges whether there is substantial evidence in the record to support TCEQ's conclusion that the landfill is compatible with existing land use. But odor is a not a specifically delineated factor for land-use-compatibility determinations. *See* 30 Tex. Admin. Code § 330.61, .53. At best, odor could be fairly characterized as only one part of these multiple considerations. *See id.* Thus, even if the evidence here conclusively establishes that there is an ongoing odor problem, it does not preclude TCEQ from concluding that the Sunset Farms landfill is compatible with existing land uses. TCEQ must only account for or balance all compatibility factors in its overall determination of whether the landfill adversely affects human health or the environment or is otherwise incompatible. As long as that balancing is not arbitrary or capricious and its determination of compatible land use is supported by substantial evidence, we may not disturb TCEQ's decision on appeal simply because the landfill may, despite regulatory-compliant odor protections, emit a rotting-garbage smell from time to time.

### BFI's land-use experts

In the second prong of its land-use compatibility issue, NNC asserts that even if we disregard the odor problems discussed above, the substantial evidence in the record does not support TCEQ's land-compatibility findings and conclusions because, NNC contends, the expert testimony of John Worrall and Charles Heimsath was so "fundamentally flawed" that it cannot provide a reasonable basis for TCEQ's finding that the landfill is compatible with existing land use. We disagree.

23

### 1. John Worrall

Worrall prepared the land-use analysis in BFI's permit application and testified in the contested-case hearing as BFI's land-use expert. On appeal, NNC complains that he disregarded TCEQ regulation 330.53(b)(8), *see* 30 Tex. Admin. Code § 330.53(b)(8) (2005) (Tex. Comm'n Envtl. Qual., Technical Requirements of Part II of Application) (describing factors in land-use determination), in his land-use determinations and instead applied a "*per se* rule that no landfill can ever be an incompatible use if the landfill existed before surrounding development," as did the Sunset Farms landfill. (Emphasis in original.) Therefore, NNC argues, Worrall's testimony cannot be substantial evidence supporting TCEQ's land-use compatibility finding.

Initially, we note that we find nothing in the record, nor does NNC make any record references in its brief, *see* Tex. R. App. P. 38.1 (requiring record references in appellant's brief), to support its suggestion that Worrall applied the "per se" rule described above rather than TCEQ regulations. To the contrary, Worrall testified that he was familiar with TCEQ regulations regarding solid-waste facilities, specifically referring to chapter 330 of Title 30 of the Texas administrative code and more specifically to section 330.53, and that his testimony and report comply with those rules. To that extent, we see no merit in NNC's assertion here.

BFI suggests that NNC bases its assertion that Worrall uses a "per se" rule on Worrall's cross-examination testimony that he has never testified against a landfill.[10] If so, that argument is also without merit. Although Worrall did testify that he had never testified against a landfill, it is not reasonable to infer from that testimony that he has any sort of "per se rule" regarding

---

[10] The ALJ noted that Worrall has never testified against a landfill, but does not suggest that was a basis for his conclusion here.

24

land-use compatibility or that he disregards TCEQ regulations. Further, Worrall testified that he was familiar with TCEQ regulations and that he follows them in determining land-use compatibility. The inference is also not reasonable in light of his additional cross-examination testimony that he has declined opportunities to testify on behalf of other solid-waste facilities because he "didn't feel that [he] could testify to the compatibility." Thus, the most we can reasonably infer from Worrall's testimony is that he testifies regarding land-use compatibility for solid-waste facilities when he believes they are compatible. That is not a basis for disregarding his testimony or rendering it incompetent to support TCEQ's finding of compatible land use.

### 2. Charles Heimsath

NNC claims that Charles Heimsath, BFI's expert on growth trends and changes in use in the vicinity of the Sunset Farms landfill, also improperly applied a "per se" rule to determine land-use compatibility, arguing that he concluded that the Sunset Farms landfill was compatible with surrounding land use "simply because there has been substantial growth in the area around Sunset Farms." In other words, "if development has occurred in the vicinity of a landfill—regardless of the reasons or circumstances—then [Heimsath will conclude that] the landfill is a land use compatible with that development." We disagree.

NNC's contention here overly simplifies Heimsath's conclusions. Heimsath testified that the Sunset Farms landfill was compatible with existing and planned uses in the area because the growth in the landfill market area has not been adversely affected by the existing landfill and is not expected to be affected by the proposed expansion. In fact, he testified that the growth in the area, both residential and commercial, has been "extremely robust" and that trend seems likely to continue in future. He did not say that the landfill was compatible simply because there had been

25

substantial growth in the area. And to the extent that his conclusion might seem to be narrowly based considering the variety of factors relevant to a land-use determination, Heimsath's admitted area of expertise here was limited to growth trends and market analysis, and he testified accordingly. Thus, his opinion regarding land-use compatibility would necessarily be limited to the areas he was charged with investigating. That is not a reason for disregarding his evidence or rendering it incompetent to support TCEQ's conclusions regarding land-use compatibility.

### 3. Substantial evidence

Having determined that NNC's specific challenges to TCEQ's land-use-compatibility conclusion are without merit—i.e., that the odor issue is not dispositive of land-use compatibility and that Worrall's and Heimsath's testimony are not incompetent—we hold that NNC has not overcome the presumption that TCEQ's conclusion as to land-use compatibility is supported by substantial evidence. *See City of Waco*, 346 S.W.3d at 813; *Collins*, 94 S.W.3d at 881 (holding that we must presume that agency's findings, inferences, conclusions, and decisions are supported by substantial evidence unless contestant proves otherwise). We note additionally, however, that there is other substantial evidence in the record to support TCEQ's land-use-compatibility conclusion and its unchallenged supporting findings. For example, TCEQ found that the only zoning ordinance applicable to the landfill did not restrict or prohibit the proposed vertical expansion of the landfill. In support of that finding was the testimony of Worrall that a small strip of the landfill was zoned "DR" by the City of Austin, but that designation does not restrict or prohibit the proposed expansion, and that there were no other zoning restrictions applicable to the landfill. This evidence was undisputed and uncontroverted. TCEQ also found that the predominant land use (62%) within one mile of the permit boundary was "open," which includes agricultural property, vacant property,

and rights-of-way, that the next largest land use (21%) was industrial, which designation includes the two active landfills, and that the next largest land use (11%) was residential. The evidence supporting this finding includes the application materials and the testimony of Worrall, both of which stated these facts and figures, which were not disputed or controverted. TCEQ also found that "[s]olid-waste disposal has been an historically and geographically significant land use within one mile of the landfill since at least 1968." In support of that finding is Worrall's undisputed and uncontradicted testimony regarding the same. TCEQ found that "[w]hile substantial residential growth is occurring within one mile of the permit boundaries . . . , most of this activity is relatively distant from the Landfill." Again, this finding is taken directly from Worrall's and also Heimsath's undisputed and uncontroverted testimony regarding the same. TCEQ found that "[t]he nearest residence to the landfill is approximately 1,045 feet east of the permit boundary and 1,830 feet from the limit of the fill." This finding is again based on Worrall's testimony. Finally, for example, TCEQ found that BFI included in its application sufficient information regarding land use and land-use compatibility. That testimony is supported by the existence of the application, which includes all information required by TCEQ regulations.

We overrule NNC's second issue on appeal.

**24/7 landfill operations**

In its third issue, NNC challenges TCEQ's order regarding the landfill's operating hours. Section 330.118 of TCEQ regulations requires landfills to operate between 7am and 7pm, Monday through Friday, unless they get TCEQ approval to operate outside those hours. *See* 30 Tex. Admin. Code § 330.118(a) (2005) (Tex. Comm'n Envtl. Quality, Facility Operating Hours). In this case, TCEQ approved BFI's request that it be allowed to maintain the 24/7 operating hours allowed

under its prior permit. On appeal, NNC asserts that TCEQ's decision that 24/7 operating hours are appropriate is not supported by substantial evidence.[11] We disagree and hold that there is substantial evidence to support TCEQ's approval of the 24/7 operations. The following is a summary of the substantial evidence supporting 24/7 operating hours:

- BFI's existing permit authorizes it to operate on a 24/7 basis;

- The landfill's current operating hours are 24 hours per day Monday through Friday and from 12am to 3pm on Saturdays, with no hours on Sundays;

- Sunset Farms landfill has operated during the above hours since at least 1982;

- TCEQ approved 24/7 operating hours for the Sunset Farms landfill in its original permit and in 2006;

- BFI has established long-standing waste-delivery schedules and acceptance procedures that its customers rely on;

- These operating hours are consistent with other similar landfills in the county;

- 24/7 operating hours are consistent with industry practices;

- There are no zoning ordinances prohibiting 24/7 operating hours;

- TCEQ's executive director is "not aware of potential impacts rising to a level that would justify restricting the proposed operating hours";

- BFI will post a sign at the entrance of the Sunset Farms landfill showing its operating hours;

---

[11] Before approval of the permit amendment at issue in this case, the Sunset Farms landfill operated 24 hours a day, seven days a week. In its application for a vertical-expansion amendment to its permit, BFI requested authorization to continue 24/7 operations. After the contested-case hearing, the ALJ initially found that the evidence did not support 24/7 operations and recommended that the hours be restricted to 7 a.m. to 7 p.m., Monday through Friday. The ALJ later changed his ruling to support 24/7 operations on the ground that the protestants, including NNC, carried the burden of proof on this issue, not BFI. TCEQ rejected the ALJ's burden-of-proof explanation, but found that BFI had produced sufficient evidence to support 24/7 operations.

28

- When the landfill is not open for waste acceptance, landfill construction and maintenance, waste composting and processing, gas plant operation and maintenance, landfill maintenance, equipment maintenance, office work, and other activities may be performed at the landfill site;

- BFI will not operate heavy construction equipment after 9pm Saturday or before 8am or after 9pm on Sunday, except for emergencies or weather-related events; and

- A September 8, 2008 traffic study showed that 23% of the Sunset Farms landfill's daily volume arrived at the facility between 7pm and 7am.

Although this evidence may not compel the conclusion reached by TCEQ—i.e., that 24/7 operations were appropriate—it is sufficient to withstand a "substantial evidence" attack. Clearly, reasonable minds could have concluded that 24/7 operations were appropriate.

NNC argues that BFI's evidence is too limited and "unremarkable" to constitute substantial evidence in light of, NNC asserts, the "extensive" evidence showing that 24/7 operations are not warranted. Specifically, it contends that BFI's "only" evidence is that the current permit allows 24/7 operations, other Travis County landfills allow 24/7 operations, and that such hours are industry standard. But, as can be clearly seen in the above summary, the evidence relating to 24/7 operations is not so limited. We also disagree that the evidence opposing 24/7 operations was "extensive." Although Greg Guernsey, who is the City of Austin's director of neighborhood planning and zoning, recommended that the landfill's operations be limited to daylight hours "to lessen the impact on existing and proposed residential uses and adjacent civic uses," he did not state that 24/7 operations would be inappropriate, nor did he explain how operations would affect existing uses. Further, although three landfill neighbors testified briefly about noise complaints related to nighttime operations of the landfill, it would be difficult to characterize their testimony as extensive. Even if the evidence in the record preponderates against TCEQ's decision to allow 24/7 operations,

29

the evidence may nonetheless amount to substantial evidence.  *See City of El Paso*, 883 S.W.2d at 185; *see also Mireless v. Texas Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999) (holding that we must affirm agency findings if there is more than a scintilla of evidence to support them).

We overrule NNC's third issue.

**Natural drainage patterns**

In its fourth and final issue on appeal, NNC asserts that TCEQ's findings regarding "no substantial alteration of natural drainage patterns" are not supported by substantial evidence and are arbitrary and capricious because BFI's own drainage analyses from 2002, 2005, and 2006 "plainly show" that the landfill's drainage patterns have been significantly altered.  Specifically, NNC asserts that BFI's drainage analysis from 2005 for two particular outfall locations[12] differs "drastically" from drainage analyses submitted in 2002 and 2006.  Relatedly, NNC argues that BFI's drainage expert, Adam Mehevec, failed to adequately explain these discrepancies in light of the fact that NNC and the other protestants had no opportunity to bring their own experts to challenge the analyses because the discrepancies were not disclosed prior to the contested-case hearing.  We disagree.

Under TCEQ rules, MSW landfills may not significantly alter the landfill site's natural drainage patterns.  *See* Tex. Admin. Code § 330.55(b)(5)(D) (2005) (Tex. Comm'n Envtl. Quality, Site Development Plan).  To ensure that the landfill will not alter the natural drainage patterns, section 330.56 requires MSW permits to include, in relevant part, a groundwater and

---

[12]  In this context, an outfall is the discharge point of a waste stream into a body of water. According to the record, there are six outfall locations at the Sunset Farms landfill, but only outfalls 4 and 5 are addressed in this case.

30

surface water protection plan and a drainage plan showing that the natural drainage patterns at the site will not be significantly altered and "discussion and analyses to demonstrate that natural drainage patterns will not be significantly altered as a result of the proposed landfill development." *Id.* §§ 330.56(f)(2), (f)(4)(iv) (2005) (Tex. Comm'n Envtl. Quality, Attachments to Site Development Plan). TCEQ also provides regulations to help calculate this information. *See, e.g.*, *Guidelines for Preparing a Surface Water Drainage Plan for a Municipal Solid Waste Facility* (June 2004) *available at* http://www.tceq.state.tx.us/assets/public/comm_exec/pubs/archive/rg417.pdf.

In 2002, BFI submitted this type of drainage information for the Sunset Farms landfill in connection with a requested modification of its then-existing permit, and TCEQ ultimately granted the modification.[13] The drainage information offered with the 2002 application showed peak flow rates for outflow 4 were 26 cfs for both the existing and proposed conditions, and the peak flow rates for outflow 5 were 66 cfs for both the existing and proposed conditions. According to the expert who calculated these numbers, they were determined using methodologies in place in 2002.

In 2006, BFI submitted an application with TCEQ to amend its MSW permit by reducing the landfill permit and reconfiguring certain disposal cells. In connection with this permit application, however, BFI did not recalculate peak flow rates for outflows 4 and 5 using the new methodologies; instead, BFI simply used the same numbers for outflows 4 and 5 from the 2002 permit application because the proposed changes in the 2006 application would not affect the flow rates for those two outflows.

---

[13] The 2002 modification to the Sunset Farms landfill increased the allowable height of the landfill by ten feet.

As required, BFI likewise submitted drainage information in connection with the 2005 permit application that is at issue in this case. That drainage information shows that the peak flow rates for outfall 4 were 66 cfs under existing conditions and 61 cfs under the proposed conditions, and that the peak flow rates for outfall 5 were 175.4 cfs under existing conditions and 171 cfs under the proposed conditions—i.e., both peak flow rates decrease under the proposed condition. These numbers were calculated using the post-2004 methodologies.

The following chart summarizes the peak-flow information BFI submitted in 2002, 2005, and 2006 with regard to a 25-year rainfall event:

|  | Outflow 4 existing | Outflow 4 proposed | Outflow 5 existing | Outflow 5 proposed |
|---|---|---|---|---|
| 2002 permit | 26 cfs | 26 cfs | 66 cfs | 66 cfs |
| 2006 permit (2002 numbers) | 26 cfs | 26 cfs | 66 cfs | 66 cfs |
| 2005 permit application (using newer methodologies) | 66 cfs | 61 cfs | 175 cfs | 171 cfs |

NNC argues that if the proposed peak flows for outflows 4 and 5 were 26 and 66 respectively in 2002 and 2006, then the existing peak flows for the 2005 application should also logically be 26 and 66 respectively. In other words, NNC asserts that the *proposed* flow rates in the 2002 and 2006 permit applications must logically be the *existing* flow rates after the permits were approved and the application changes were implemented. Thus, NNC argues, because the 2005 proposed peak flows—66 and 171 cfs respectively—are more than twice the respective peak flows from the prior permits, the evidence in the record "plainly" shows that the drainage patterns at the site were

significantly altered. But in fact, NNC's argument here is not logical at all, either on the face of these documents or, more appropriately, taken in context of the testimony explaining these figures.

Given the purpose of the information—i.e., to show whether the existing drainage patterns will be significantly altered by the requested proposed landfill changes—the most logical way to interpret these documents in isolation is to confine the comparison of peak-flow numbers to the information contained within the document itself. First, the documents present as self-contained to the extent that they do not refer to or incorporate other information. Further, while the *proposed* peak flow at an outflow as determined in 2002 may, in fact, be the *existing* peak flow at that site after the proposed changes to the landfill were made, it is also possible that the existing peak flow is different. On the other hand, by treating each document as self-contained, we are assured that the information calculated refers to the then-existing and then-proposed numbers. For these reasons, it is not logical to pull information from one document and insert it into another, and on its face, the peak-flow information submitted as part of the 2005 permit amendment conforms to TCEQ rules and shows no significant alteration in the drainage pattern.

But we do not have to interpret the peak-flow information in isolation. BFI's witness Adam Mehevec testified about why the peak-flow data from the 2002 and 2006 documents appear so different from the 2005 data. First, he explained that the 2002 peak-flow numbers were calculated using outdated methodology, including a different runoff coefficient. Second, he explained that BFI had more accurate topographical information in 2005 than it did in 2002 that would affect the peak-flow calculations. Finally, he explained that the 2002 numbers would be different from the 2005 numbers because the 2002 calculations accounted for certain buffer areas of the landfill that were not included in the 2005 calculations. In sum, he testified that while the numbers might appear

33

to be manipulated in such as way as to show a change in peak flow, they are not comparable—*i.e.*, they are "apples to oranges" versus "apples to apples"—because they use different base assumptions and different methodology. He then reasserted that, based on the calculations of peak flow as set forth in the 2005 application documents, the existing drainage patterns would not be significantly altered by the proposed height increase to the landfill.

NNC also complains that Mehevec's explanation for the alleged discrepancies came as a surprise to it and the other protestants during the contested-case hearing because the anomalies were never disclosed by BFI in the application. As a result, NNC contends, it and the other protestants "were deprived of the opportunity to meaningfully test Mr. Mehevec's eleventh-hour drainage anomalies at Outfalls 4 and 5." We disagree. First, as discussed above, there are no anomalies on the face of the 2005 drainage documents upon which Mehevec based his testimony. And even if we assume there are anomalies by incorporating 2002 and 2006 documents, NNC had access to pre-trial discovery documents that would have included these so-called anomalies and all of Mehevec's documents, and Mehevec was presumably available for deposition prior to the contested-case hearing. Further, NNC's attorney did not object to the testimony or otherwise request relief related to Mehevec's testimony.

Having determined that the drainage information for outflows 4 and 5 is not contradictory and that BFI's expert witness provided an adequate explanation for the differences in peak-flow figures, we hold that NNC has not overcome the presumption that TCEQ's findings of fact regarding drainage flow are supported by substantial evidence. Further, TCEQ's conclusion that the proposed changes to the landfill will not significantly alter the natural drainage patterns is supported by substantial evidence in the record as a whole.

We overrule NNC's fourth issue.

**CONCLUSION**

Having considered and overruled each issue on appeal, we affirm the district court's judgment affirming TCEQ's order.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed:   March 28, 2013